**UNITED STATES v. WEIRTON STEEL CO. (two cases).**

Nos. A–5634, A–5635.

District Court, N. D. West Virginia.

Nov. 14, 1945.

Joe V. Gibson, U. S. Atty., of Kingwood, W. Va., E. E. Hamstead, Asst. U. S. Atty., of Morgantown, W.Va., Theron L. Caudle, Asst. Atty. Gen., and Gordon L. Eakle, Sp. Atty., of Washington, D. C., for plaintiff.

Earl L. Maxwell, of Elkins, W. Va., and Earl F. Reed and John E. Laughlin, both of Pittsburgh, Pa., for defendant.

BAKER, District Judge.

To each of the above indictments the defendant has entered a plea of nolo contendere. The first case, No. A-5634, contains 11 counts, and the second, No. A-5635, contains 26 counts. While from a purely technical point of view a plea of nolo contendere does not admit the allegations of the charge, but merely says that the defendant does not choose to defend the same, in this instance, after reading the reports of the investigating officers, I am compelled to hold that the charges in every count of the two indictments could be amply substantiated by proof. It must be understood, of course, that where I make statements of fact in this Memorandum, I am reciting the facts as shown by the Investigator's Reports now in my hand.

The first indictment, A-5634, containing 11 counts, charges the defendant with having made false representations in a matter within the jurisdiction of the War Production Board in violation of Title 18, Section 80, United States Code Annotated.

The second indictment, A-5635, containing 26 counts, charges the defendant with having violated certain orders and regulations of the War Production Board in obtaining critical materials and doing unauthorized construction on the club house at the Williams Country Club.

In this connection, while it has no direct bearing on the case, it might be well to note that Weirton Steel Company is a wholly-owned subsidiary of National Steel Corporation. The Williams Country Club is a corporation maintaining a club house upon property owned by a wholly-owned subsidiary of Weirton Steel Company. For all practical purposes, it may be said that the Williams Country Club is a club maintained for the benefit and enjoyment of the officials and guests of the Weirton Steel Company and its parent, National Steel Corporation.

On June 28, 1940, 54 Stat. 676, Congress passed a law entitled "An Act to expedite national defense, and for other purposes," which gave the President certain broad powers. These powers were further expanded by the Second War Powers Act of 1942, 50 U.S.C.A.Appendix, § 633. Under these two laws various orders and directives were issued granting the War Production Board the power and authority to allocate critical materials for national defense and essential civilian use. Among those orders and regulations were some which are herein alleged, and by implication admitted, to have been violated; namely, Conservation Order L-41, which prohibits construction of buildings (with certain exceptions not relevant to this case) in the absence of specific permission of the War Production Board; Preference Rating Order P-68, an order granting priority assistance to enable producers of iron and steel to obtain materials and equipment for maintenance of their plant facilities; Priorities Regulation No. 3, prohibiting the use of preference ratings for any other purpose than that for which they were assigned; Priorities Regulation No. 1, requiring persons given priorities assistance to use the preference ratings given them for the particular purpose for which the assistance was given; Conservation Order M-9-c-4, prohibiting the accepting of delivery of copper or copper base alloy products unless the person making delivery was permitted to do so by the War Production Board; and Conservation Order M-126, prohibiting the accepting of delivery of iron or steel products made in violation of said Order.

There is no doubt, in light of the Investigator's Reports, that these orders and regulations were wilfully violated and that the false representations were made. The defendant, however, attempts to justify or excuse these violations on grounds which will now be considered in the order that they are presented in Defendant's Brief.

First, the defendant, in a half-hearted way, attempts to fall back on the old excuse that the orders are difficult to interpret or understand. The court might lend a sympathetic ear to this plea if coming from a private citizen or small merchant, but I feel that I am justified in taking judicial notice of the fact that a corporation of the magnitude and caliber of the Weirton Steel Company would have an able corps of priority experts who would keep thoroughly abreast of all regulations, and certainly of those pertaining directly to the steel and construction business. If any doubts existed in the minds of the company, they would have certainly obtained the best possible advice before acting. In this connection it should be borne in mind that time was not at all of the essence in the construction of a country club. The defendant further pleads its contribution to the war effort in mitigation of the offense here committed. This court knows and appreci-

ates the splendid service that Weirton Steel Company has rendered the United States during the critical years just passed. In many instances Weirton can justifiably claim that it has been the most outstanding supporter of the war effort in the United States. That is appreciated by this court and has been taken into consideration in the sentence which will be pronounced herein. The next item of defense advanced by the Weirton Steel Company is that the addition to the country club was of a minor nature. The facts do not bear this out. As nearly as can be ascertained from the reports, the cost of the construction and equipment of this addition aggregated $78,295.06. It consisted of five rooms added as a second story to the west wing of the club house. This addition is made accessible by a heavily carpeted stairway leading from the lobby on the first floor to the new portion above. At the top of the stairs is a highly ornamental wrought-iron grill in keeping with a wrought-iron stair railing. A metal sign marked "private" is suspended from the gate which opens into a second floor foyer. On the right side of the foyer is a private telephone room. On the left side is the entrance to a large bedroom and private bar. A long hall extends from the foyer to the rear of the building. Doorways on the left of the hall give entrance to two additional bedrooms, each with private bath. These bedrooms are approximately 12 x 18 feet each. At the end of the hall is a lounge room, 12 x 25 feet in size. Between this room and the last bedroom are a fully equipped bar, kitchenette, and lavatories. The walls of the foyer, hall, and lounge are paneled with pressed wood walnut veneered paneling. Other interior finishing trim is of high quality and luxurious character. The bathrooms in each of the three bedrooms are finished in Carrara glass with lavatories, toilets, and glassed-in showers. Floors of all rooms are completely covered with heavy carpeting in harmony with the decorative scheme of the different rooms. A sprinkler system has been installed equipped with chromium-plated outlets, and the entire section is air-conditioned. To say that this was intended to be used as a hospital is an insult to the intelligence of any court.

At this time it might be well to summarize chronologically the history of the transactions involved. In this Memorandum I will not attempt to deal with the misuse of any of the essential materials which were misused other than the air-conditioning system, since that is a matter concerning which the court has the best information.

On December 17, 1943, the Weirton Steel Company contacted the Danforth Air-Conditioning Company of Pittsburgh, Pennsylvania, relative to the installation of certain air-conditioning equipment. Mr. Wilbur C. Sutherland, Manager of the Danforth Company, went to Weirton and in company with Mr. Harry W. Wright, Assistant Chief Engineer for Weirton, calculated the requirements for an air-conditioning system for "emergency hospital rooms" to be located on the country club grounds. Mr. Sutherland had some discussion with Mr. Wright on the subject of the limitations on procurement of the necessary equipment and expressed the opinion that it would be difficult to obtain priorities. He was told that "they were the Weirton Steel Company and they could handle any priority difficulties which would come up."

On January 24, 1944, the Weirton Steel Company filed application with the War Production Board for priorities to obtain this air-conditioning equipment, and about the same time started actual construction on the addition to the country club. This application was denied on February 2, 1944, and in the face of that denial on February 8, 1944, the Weirton Steel Company contracted with the Danforth Company for the purchase of the equipment.

On February 21, 1944, the Weirton Company filed a second application, which was treated as an appeal and was approved on March 17, 1944, and on March 21, 1944, the Danforth Company was furnished with the necessary priority data.

In all the transactions between Danforth Company and Weirton, Mr. Sutherland said that his company was doubtful of the job, but that Weirton insisted that the rooms were to be used as a hospital, although the country club is about four miles from the plant of the Weirton Steel Corporation.

In addition to this Mr. Weiss, of Gardner Display Company, said that he was contacted relative to the installation of a bar in the addition to the country club by a Mr. Kline, Chief Engineer for Weirton Steel Company; that he told Mr. Kline that he could construct the bar, but could not obtain the priorities for the needed equipment and Mr. Kline said that Weirton would take care of all priorities.

From all of this the court is driven to the conclusion that the defendant deliberately and premeditatedly set out to obtain high priority materials by false representations and to use the same in violation of the War Production Board's Orders and Regulations. It is fruitless to continue a discussion of the matters here involved. Weirton says that it was constructing this addition to the club primarily as a convenience for Government officials, who of necessity visited the plant and who would otherwise have had to obtain lodging in Steubenville, Ohio, which after all would be about as close as the Williams Country Club. This may be true, but in time of war or in time of peace there must be some constituted authority to determine and regulate the conduct of the citizens of this country. Congress saw fit to place this authority in the President of the United States and the War Production Board. To permit an individual or a corporation, however patriotic, to substitute his views for those of the constituted authority would inevitably lead to anarchy and disregard for all law and order. We all know that many of the wartime regulations were unpopular, but the private citizen cannot choose which law he will obey and which he will disregard. The court has no alternative other than to enforce every law as it is written and interpreted.

After a careful deliberation of this case I have concluded to assess fines as follows:

On Indictment, No. A–5634, consisting of 11 counts, $4,000 on each count, or a total of $44,000.

On Indictment No. A–5635, consisting of 26 counts, a fine of $4,000 on each count, or a total of $104,000, making a total fine of $148,000 on two indictments.