**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Andrew LANGE, d/b/a Lange
Construction Company,
Defendant-Appellant.**

No. 75–2022.

United States Court of Appeals,
Fifth Circuit.

March 22, 1976.

Richard T. Simmons, Jr., Asst. Federal Public Defender, John Volz, Federal Public Defender, New Orleans, La., for defendant-appellant.

Gerald J. Gallinghouse, U. S. Atty., John H. Musser, IV, Mary W. Cazalas, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before WISDOM and GEWIN, Circuit Judges, and MEHRTENS, District Judge.

GEWIN, Circuit Judge:

Appellant Andrew Lange was indicted and tried as an individual[1] for making a false statement in a matter within the jurisdiction of a federal agency in violation of 18 U.S.C. § 1001.[2] After the trial judge denied his motion for a directed verdict of acquittal, Lange was convicted by the jury. His sentence was suspended and he was placed on active probation for 24 months. During its deliberations, the jury sent a note to the court stating that it was "Hung up." The judge requested the jury to continue

---

1. The indictment is styled, "*United States of America v. Andrew Lange, d/b/a Lange Construction Co.*" It is nowhere indicated that the company was a corporation and it is not mentioned in the body of the indictment. Only Lange as an individual is mentioned in the indictment.

2. This section was originally enacted as a part of an 1863 statute, which had been passed in response to a proliferation of frauds upon the federal government. Initially, the provision covered only false claims against the government and false statements entailing pecuniary or property loss to it. During the Great Depression and as a result of the "hot oil" scandals, the act was broadened to its present form, which does not require pecuniary or property loss. The congressional intent in broadening the statute was to ensure the effi-

cacy of the ever-increasing federal regulatory system. *See United States v. Gilliland*, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941); *Friedman v. United States*, 374 F.2d 363, 366 (8th Cir. 1967). The statute now states:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001.

to deliberate and the guilty verdict was returned thereafter.

The tone of this case and the nature of the evidence was succinctly and accurately characterized by the learned and experienced trial judge. He made the following observation at the time of sentencing Lange:

> On the basis of the information at my disposal, Mr. Andrew Lange, the defendant herein, is a law-abiding citizen and a good family man, and a regular church-goer. Furthermore, I will state for the record, I have my own doubts that he had specific intent to submit a fraudulent statement to an agency of the United States [G]overnment.

After a thorough review of the record, it is our conclusion that the evidence of Lange's specific intent to make a material misrepresentation was insufficient to create a jury question and that his motion for a directed verdict of acquittal should have been granted.

The basis of the prosecution and conviction was Lange's signing an "all bills paid" affidavit[3] for the Community Improvement Agency (Agency). The Agency is a local instrumentality of the City of New Orleans that receives some of its funds from the Department of Housing and Urban Development (HUD). One of the Agency's functions is to finance the relocation of persons who are displaced by urban renewal projects in the city. If, for example, such a person desires to move to a sub-standard dwelling, the Agency funds the cost of remodeling the residence. The cost of the work must come within certain limitations and the work must bring the dwelling up to existing building code standards.

Mrs. Genevieve Johnson was a relocation victim of New Orleans' first urban renewal project. She desired to be relocated in a sub-standard residence in Covington, Louisiana and the Agency sought to fulfill this desire. However, it was unfamiliar with building contractors in the Covington area and requested that the city's Chamber of Commerce recommend a reputable contractor who would make the necessary repairs.

Pursuant to this request Andrew Lange was contacted and on February 23, 1973 the Agency was notified that he would undertake the repairs at a cost of $5,200. Lange was informed that Mrs. Johnson was entitled to only $5,000 in benefits. He lowered his bid to this price and it was accepted.

Lange commenced the repairs shortly thereafter. In the course of the work, Mr. Eddie Triggs, a social service officer of the Agency, testified that he discussed the project with Lange and explained that the Agency, hence the Johnson contract, was federally funded.[4] By late

---

3. A copy of the affidavit is attached to this opinion as Appendix A.

4. At best some of the testimony of Mr. Triggs is not a model of clarity. We quote from the transcript:

Q. Mr. Triggs, first of all, you indicated this was a federally-funded agency?
A. That is correct.
Q. Were you talking about the funds that were dispersed, or how about the agency itself? It is a state agency, isn't it?
A. It's a state agency, but the local share of money came from the city.
Q. It is still a state agency?
A. Correct.
Q. Is your salary paid by the federal government or the state?
A. My salary is paid by the state.
Q. You are not paid by the federal government. When you say, "federal", you are talking about the funds you are working with are partially federal?
A. They are federal, but dispersed by the state.
Q. But the agency, the Community Improvement Agency, is a state agency?
A. Yes.
Q. Have you ever seen the agreement between the Community Improvement Association and the federal government? Do you know exactly what the terms are and how it works?
A. I have seen it, but I don't know exactly what the terms are.
Q. So you are not really familiar with what the conditions are, and how the federal government and the state government works, as far as this particular—
A. Not in terms of exact details, no.

March Lange had completed the repairs to Mrs. Johnson's satisfaction.[5]

Eddie Triggs explained to Lange that in order to receive reimbursement for the work, it was necessary that he and Mrs. Johnson sign the "all bills paid" affidavit. On March 26 the two signed such a document and Lange received $4000 from the Agency. On April 27 Lange received a check for the remaining $1000.

The evidence revealed that Lange obtained a large part of the supplies utilized on the Johnson residence from Wickes Lumber and Building Supplies (Wickes). At the same time that he was performing the Johnson repairs, he was working on another and much larger job for one Landrum. Wickes also supplied much of the material for the latter contract. Wickes billed Lange at the end of each month, and when Lange paid Wickes he did not identify the payments by the job on which the supplies were used.

On March 15 Lange paid the February bill in full, but this bill apparently arose out of materials for the Landrum contract that had been purchased in February. The materials for the Johnson repairs were acquired by Lange from March 1 through March 13. The only evidence of these purchases are carbon copies of the sales invoices or delivery tickets. These copies contain Lange Construction Company's name and address as the purchaser, all are stamped with the word "CHARGE," and all but two, which are labelled "INVOICES," are signed "Andrew Lange Sr." The cost of the materials and supplies represented by these documents totalled $1,324.97 and was never paid by Lange. This non-payment is the cause of the prosecution.

These invoices or receipts were introduced into evidence through the testimony of Charles Cucchiara, an employee of Wickes.[6] Mr. Cucchiara testified that Wickes had been paid $1000 by a federal agency in settlement of the balance represented by the invoices. He also testified, however, that the purchases made by Lange in March would not be due until April 10 and that these purchases were not due on March 26 or 27. Neither the end-of-the month statement that Lange should have received for the March purchases nor a copy of it was ever introduced into evidence. Cucchiara did not have a record of a statement sent to Lange at the end of March. He did have a copy of such a statement sent to him at the end of April. The statement Cucchiara had for March referred to another person named Lange and not to the appellant Lange.[7] The

---

Q. You are testifying as to your general knowledge from what people have said how it works?

A. You are referring to Act 170, and it is really too lengthy. I guess you have to be a lawyer to really interpret it.

Tr. pp. 26–7.

5. There was substantial evidence that Lange had performed repairs not required by the contract as a gratuity.

6. Mr. Cucchiara subsequently gave strong testimony to the good character and reputation of Lange from which he never varied.

7. The following excerpts are taken from the government's brief under the designation "Statement of the Case." (emphasis added):

Cucchiara's records showed that on March 15, 1973, a payment was received from Lange in the amount of $1,640 for obligations in February. The February statement was sent out towards the end of February. Some returned items were credited in the amount of $115.34. On February 28th, there was a $200 payment for part of his February bill. *On March 15th, there was no amount due. The indebtedness incurred by Lange in March was due on April 10th.* There were a number of items purchased in March for the Johnson job and for another larger job. In February, Lange purchased materials for the Johnson job in the amount of $192.24 for which he paid. *Purchases made between March 1st and 13th of 1973 were not due until April 10, 1973.*

Government brief pp. 9–10.

\* \* \* \* \* \*

Cucchiara's company had not supplied all materials used on the Johnson job. He thought that his company supplied about $2,000 worth. The March 15, 1973 payment covered purchases for that job made by Lange in February of 1973. Approximately $3,019.89 worth of materials were purchased by Lange for another job between March 1 and April 14, 1973. Cucchiara did not have

only evidence the government introduced concerning any obligations of Andrew Lange for the Johnson repairs were the sales invoices for the purchases in March. A lien against the Johnson residence for Lange's failure to pay for the materials was not filed until June of 1973.

Cucchiara testified that he had discussed Lange's debts to Wickes in March—but that this discussion concerned the Landrum supplies that were supposed to be paid for on a cash basis. He stated that he did not discuss Lange's entire account until April. He also said that Lange had an outstanding obligation during March for the Johnson purchases, but, again, that this obligation was not due until April 10.

Lange had several persons testify to his reputation for honesty and his general good reputation. The government offered no witnesses in rebuttal of this testimony. Andrew Lange also took the stand in his own behalf.

Lange's testimony revealed that at the time of trial he was fifty-one years of age, had been married thirty-four years and was the father of ten children. He had achieved a sixth grade education before World War II. During that conflict he served as a truck driver under General Patton and afterwards he returned to school and completed his education at the tenth grade level. He worked as a laborer for contractors from 1945 to 1970. In 1971 he went into business for himself, incorporating as Lange Con-struction Company. He had no experience as a bookkeeper, as evidenced by his failure to identify the materials and supplies purchased with the specific contracts being performed. In 1974 he was adjudicated a bankrupt.

Lange further testified that the Johnson contract was the first time he had dealt with the Agency. He had paid in full all labor costs that arose from the Johnson job. He thought he had paid the Johnson bills in full at the time he signed the affidavit.[8] He testified that he had never received a statement in April for the Johnson materials and that the filing of the lien was his first notice of indebtedness to Wickes for that contract. This testimony was not contradicted.

The prosecution's impeachment of Lange, when viewed most favorably to the government, was directed toward proving that it was incredible for Lange to claim that he did not know he owed money for the materials purchased in March when he signed the affidavit. Lange responded that to the best of his recollection he had not received a statement in April.[9]

In this court Lange argues several grounds for reversal. He contends that the evidence of specific intent is insufficient to support the conviction; the district court should have given requested jury instructions concerning the meaning of the term "false" as used in § 1001;[10] the evidence was insufficient

---

the statement sent out at the end of March. He did have a statement sent out at the end of April. The statement he had for March referred to another person named Lange and not the Lange involved herein. The last date materials were supplied to the Johnson job was March 13, 1973.
Government brief p. 10.

8. Lange never waivered in his testimony even in the face of strenuous and repeated cross-examination on the issue. Mrs. Johnson also had previously testified without objection that Lange told her, at the time of signing, that he had paid all the bills.

The following is from the government's brief under the designation "Statement of the Case:"

Before she [Mrs. Johnson] signed the documents, a call, paid for by Lange, was made to the Community Improvement Agency. The person Mrs. Johnson spoke with told her that it was all right to sign.

9. See note 7 supra.

10. It is clear that the word "false" as used in § 1001 must mean more than simply incorrect or untrue. An intent to deceive or mislead is required under the act, e. g., United States v. Snider, 502 F.2d 645, 651–52 & n.12 (4th Cir. 1974). In the instant case the trial judge correctly charged the jury concerning the requisite mens rea. Supp. Record at 145.

to support a finding that the affidavit was a matter within the jurisdiction of a federal agency;[11] the trial court's instruction concerning evidence of good reputation was incorrect and the court erred in refusing a requested instruction as to such evidence.[12] Since we have concluded that Lange's first specification of error is meritorious, we find it unnecessary to treat his other contentions in detail.

■ Proof of five elements is essential to sustain a conviction under the false statement proscription of § 1001: (1) a statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction.[13] With respect to the second requisite, it is doubtful whether in this case the government even proved the falsity of the March 26 affidavit. We will assume, however, that this factor was proved because it is our firm conviction that the necessary *mens rea* was not shown.

■ We are fully cognizant of the principles that it is the proper and exclusive function of the jury to determine the guilt or innocence of a defendant, *United States v. Black*, 497 F.2d 1039, 1041 (5th Cir. 1974); *United States v. Warner*, 441 F.2d 821, 825–30 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); that the evidence must be viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *United States v. Wells*, 506 F.2d 924, 926 (5th Cir. 1975); and that all reasonable inferences and credibility choices that support a verdict of guilty by a jury must be made, *United States v. Black, supra*; *United States v. Squella-Avendano*, 478 F.2d 433, 435 (5th Cir. 1973). Nevertheless, these general rules do not require that a jury verdict of guilty must be affirmed in all circumstances.

11. In light of Triggs' testimony that Lange was informed of the federal government's connection with the funding and the affidavit, although rather vague, we are unable to conclude that this affidavit was not a matter within the jurisdiction of a federal agency. *Compare United States v. Candella*, 487 F.2d 1223, 1225–27 (2nd Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974), *with Lowe v. United States*, 141 F.2d 1005 (5th Cir. 1944). The affidavit need not have been submitted directly to a government agency for § 1001 to apply. *See United States v. Kraude*, 467 F.2d 37, 38 (9th Cir.), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 684, 34 L.Ed.2d 664 (1972); *Ebeling v. United States*, 248 F.2d 429, 434 (8th Cir. 1957). This case does not involve an "exculpatory no" situation, which entails interpretation of the meaning of "statement" rather than "in any matter within the jurisdiction" in § 1001. *See United States v. Lambert*, 501 F.2d 943, 946 & nn.2A–4 (5th Cir. 1974) (en banc).

12. Although we do not agree with Lange's position that the jury should have been instructed that lack of discussion in the community of bad traits of a defendant's character raises a presumption that it must be good, the instruction actually given by the court concerning reputation evidence is somewhat disturbing. This court has recently reversed a case wherein the trial court charged the jury, *inter alia*, "[E]vidence of good [character] should not constitute an excuse to acquit the defendant if you, the jury, after weighing all of the evidence in the case, is convinced beyond a rea-

sonable doubt that the defendant is guilty . . . ." *United States v. Leigh*, 513 F.2d 784, 785 (5th Cir. 1975) (emphasis in original). This court reasoned in *Leigh* that such an instruction denigrates the value of reputation evidence in violation of the holding of the Supreme Court in *Edgington v. United States*, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896). In *Leigh* the court also noted that it was "particularly troubled by the judge's use of the word 'excuse,'" 513 F.2d at 786.

In the case *sub judice* the court charged in relevant part, "[E]vidence of good character should not constitute *an excuse* to acquit the defendant if you, the jury, after weighing all the evidence, *including the evidence of good character*, are convinced beyond a reasonable doubt the defendant is guilty . . . ." (emphasis added). This instruction is not subject to the same objection as that in *Leigh* in light of the second italicized portion, and it conforms with instructions approved in the formbooks, *e. g.*, E. Devitt & C. Blackmar, *Federal Jury Practice & Instructions*, at 122 (2d ed., Supp.1974); LaBuy, *Manual on Jury Instructions in Federal Criminal Cases*, 33 F.R.D. 523, 583 (1964). Nevertheless, it does contain the troublesome "excuse" language and this court has expressed its disapproval of such verbiage.

13. *See United States v. Smith*, 523 F.2d 771 (5th Cir. 1975); *United States v. Adler*, 380 F.2d 917, 920 (2d Cir. 1967), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1968); *United States v. Marchisio*, 344 F.2d 653 (2d Cir. 1965).

The full burden rests on the government in all criminal prosecutions to prove every essential element of the crime charged beyond a reasonable doubt. *Mullaney v. Wilbur*, 421 U.S. 684, 696–702, 95 S.Ct. 1881, 1888–1891, 44 L.Ed.2d 508, 518–22 (1975); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); C. Wright, *Federal Practice & Procedure*, v.2, § 403 at 66 (1969). When this court concludes, after applying these principles, that the jury must necessarily have had a reasonable doubt, the conviction must be reversed, *United States v. Smith*, 523 F.2d 771, 774 (5th Cir. 1975); *Nagell v. United States*, 392 F.2d 934, 937 (5th Cir. 1968). Similarly, in cases based on circumstantial evidence, the evidence (when viewed pursuant to the principles already discussed) may be insufficient to sustain a guilty verdict if it is determined that reasonable minds could not conclude that the evidence is inconsistent with the hypothesis of the defendant's innocence. *See United States v. Nazien*, 504 F.2d 394 (5th Cir. 1974), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975); *United States v. Stephenson*, 474 F.2d 1353, 1355 (5th Cir. 1974).[14]

A violation of § 1001 requires proof that the defendant had the specific intent to make a false or fraudulent statement, *cf. United States v. Markee*, 425 F.2d 1043, 1046 (9th Cir.), *cert. denied*, 400 U.S. 847, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970). The misrepresentation must have been made deliberately, *United States v. Mekjian*, 505 F.2d 1320, 1324 (5th Cir. 1975), knowingly and wilfully, *United States v. Smith, supra*, or at least with reckless disregard of the truth and with a conscious purpose to avoid learning the truth. *See United States v. Egenberg*, 441 F.2d 441, 444 (2d Cir.), *cert. denied*, 404 U.S. 994, 92 S.Ct. 530, 30 L.Ed.2d 546 (1971); *United States v. Clearfield*, 358 F.Supp. 564, 574 (E.D.Pa.1972).

The entire basis of the prosecution in this case was the affidavit Lange signed on March 26. It should be observed that the affidavit does not purport to be that of Lange as an individual, nor does it purport to be a statement of fact by him as an individual. "Lange Construction Co. Inc." is set forth in the body of the affidavit and the corporate name is affixed thereto by Andrew Lange, but not in any stated corporate capacity. Corporations can, of course, be prosecuted under § 1001, *e. g., United States v. Weirton Steel Co.*, 62 F.Supp. 961 (N.D.W.Va.1945), but we do not equate a statement issued by and in the name of a corporation with a statement by an individual. This is not, however, the chief fault we find with the evidence presented.

The relevant portion of the "all bills paid" affidavit states that, "there are (*sic*) no indebtedness against said improvements or property because of the said improvements, and that all bills for labor and materials furnished in connection therewith have been paid in full." Fairly read, this document contains two representations: that no indebtedness against the property or improvements, attributable to the improvements, existed at the time the affidavit was signed and that all bills for labor and material utilized in the contract had been paid in full at the time of signing. Accordingly, unless there is some evidence from which a jury could reasonably conclude that, at the time of signing this affidavit, Lange knew or reasonably should have known it to be false and intended to deceive by making one or both of the statements, a directed verdict of acquittal was required.

We deal first with the statement that all bills had been paid in full. The evidence was uncontradicted that Lange was billed monthly for his purchases from Wickes. As of March 15 Lange

---

14. We are not concerned at this point with special jury instructions on circumstantial evidence, which are controlled by *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). *See United States v. Squella-Avendano*, 478 F.2d 433, 436–37 (5th Cir. 1973); *United States v. Kolsky*, 423 F.2d 1111, 1113 (5th Cir. 1970).

had paid in full the February bill from Wickes. The government introduced no evidence of any March statement or bill that Lange had not paid as of March 26. Accordingly, the evidence was uncontradicted that no outstanding bills were owed to Wickes as of March 26, the day Lange signed the affidavit.

Apparently, both the government and the district court viewed the March 1–13 sales invoices as "bills" that Lange had not paid when he signed the affidavit. It is our unwavering conviction, however, that these sales invoices were merely acknowledgements by Lange that he had received the items listed. These sales invoices did not constitute evidence from which a jury could reasonably find or infer an intent to deceive by Lange with respect to the "all bills paid" portion of the affidavit. Lange had recently made a substantial payment to Wickes and had received no additional bill or statement from Wickes prior to signing the affidavit.

 The other aspect of Lange's statement was the assertion that there was "no indebtedness against said improvements or property because of the said improvements." At the outset, it is noteworthy that the affidavit is redundant if the indebtedness referred to in this phrase means indebtedness arising out of labor and materials. Even assuming such redundancy, however, this statement was not shown to be false. Further, even if there was some outstanding indebtedness against Lange or the corporation for the materials and supplies, this indebtedness was not, on March 26, an "indebtedness" against the Johnson improvements or property. From the evidence presented it is clear that on March 26 no lien had been perfected against the property, no suit had

been filed, and no lis pendens notice had been recorded or received. There is no claim that there was a mortgage on the improvements or the property or that any other type of lien or encumbrance had been filed or perfected against either.[15] Accordingly, this aspect of the affidavit does not provide a scintilla of evidence from which a jury reasonably could find or infer that Lange signed the document with actual or imputed knowledge of its falsity and with intent to deceive.[16]

 The government made no attempt whatever to rebut the strong and cogent evidence of Lange's excellent reputation. In fact, the key government witness, Cucchiara, testified to Lange's good reputation. He adhered to this testimony on cross-examination. Lange's limited education and administrative inexperience must also be weighed in the balance. The government never established that the affidavit was technically inaccurate. Under other facts and in other circumstances, proof might have been adduced which would support the conclusion of a jury that a crafty and unscrupulous person intended the affidavit to deceive despite its apparent accuracy. This is not such a case. It is our conclusion in this case that the jury could not reasonably have concluded that the evidence and reasonable inferences drawn from it established Lange's intent to deceive beyond a reasonable doubt. Accordingly, Lange's motion for a directed verdict of acquittal should have been granted. The judgment of conviction is reversed and the case is remanded to the District Court with directions to vacate the judgment and to enter an order granting the motion for acquittal and a judgment acquitting Lange.

Reversed and remanded with directions.

See Appendix A on next page.

---

**15.** As noted earlier, a lien on the Johnson property was not filed until June of 1973.

**16.** The affidavit contained no warning that the United States Government or one of its agencies was involved in the project or might receive the document. Nor did it warn of possible criminal penalties for a misstatement. 

These omissions certainly are relevant to the determination whether Lange signed the statement with an intent to deceive. Had such warnings been present, Lange would be held to a higher standard of care in signing the document.

APPENDIX A

ALL BILLS PAID AFFIDAVIT

COVINGTON, LOUISIANA

BEFORE ME, the undersigned authority, on this day personally appeared <u>Genevieve Baham Johnson</u> and his wife _____ and his contractor <u>Lange Con-struction Co. Inc.,</u> who after first being duly sworn by me deposes and says:

THAT I (we) are the owner (s) of the hereinafter described property, and the contractor thereon, situated in Covington, Louisiana. That I (we) have made certain improvements thereon and there are no indebtness against said improvements or property because of the said improvements, and that all bills for labor and materials furnished in the connection therewith have been paid in full. All work listed on the work write up for rehabilitation of my residence has been completed to my satisfaction, therefore I request final inspection and final payment.

OWNERS:

(s) <u>Genevieve Baham Johnson</u>

<u>715 N. Lee Road, Covington, La.</u>
Property

SWORN TO AND SUBSCRIBED before me this 26th day of <u>March,</u> A.D., 19<u>73</u>.

(s) <u>Howard R. Fussell</u>
Notary Public in and for St. Tammany Parish, Louisiana

CONTRACTOR:

<u>Lange Construction Co. Inc.</u>
BY: (s) <u>Andrew Lange Sr.</u>

SWORN TO AND SUBSCRIBED Before me this <u>26th</u> day of <u>March,</u> A.D., 19<u>73</u>.

(s) <u>Howard R. Fussell</u>
Notary Public and for St. Tammany Parish, Louisiana