**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Dan CALLAHAN, Defendant-Appellant.**

**No. 78-5251.**

United States Court of Appeals, Fifth Circuit.

Feb. 2, 1979.

Rehearing and Rehearing En Banc Denied March 13, 1979.

---

Edward T. M. Garland, Rhonda A. Brofman, Atlanta, Ga., for defendant-appellant.

D. L. Rampey, Jr., U. S. Atty., Samuel A. Wilson, Jr., Asst. U. S. Atty., Macon, Ga., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The appellant Dr. Dan Callahan was convicted of five counts of tax evasion in violation of 26 U.S.C. § 7201. On appeal the appellant raises a variety of issues concerning the conduct of his trial. We find no reversible errors and affirm Dr. Callahan's conviction.

## I. FACTS

Dr. Callahan, a physician from Warner Robins, Georgia, was convicted in a jury trial for tax evasion for the years 1971–1975. The government offered evidence that Callahan juggled the financial records covering his practice to avoid a total of $83,337.04 in tax liability. Callahan was fined $50,000 and sentenced to five concurrent five-year terms in the custody of the Attorney General.

The government's case was based primarily on the existence of false financial records kept in the doctor's office and large amounts of cash stored in the attic of Callahan's home. The office staff maintained a permanent office ledger which was used by Callahan's accountant to prepare his tax returns. The ledger purported to account for all office income. Through a variety of methods, however, income from patient payments was diverted and not recorded on the ledger. The principal method used to siphon receipts from the ledger was to record payments from certain patients on a duplicate cash receipts book. These payments recorded on the cash receipts book were never listed on the ledger and the cash receipts book was never shown to the tax accountant.

The trigger for the income diversion scheme involved Callahan's notation of a code acronym, "NOL," standing for "not on ledger." When a patient entered the doctor's office he would sign his name on a sign-in sheet. Office personnel then would pull the patient's medical history file and attach a small blank tab of paper. The file, with the attached slip of paper, would be hung on the door of the examining room. After examining the patient, Callahan would write on the slip of paper the amount of money which the patient would be charged. If only the dollar amount appeared on the paper, office personnel would accept payment from the patient and record it on the office ledger. Whenever Callahan added the "NOL" notation to the dollar amount written on the slip of paper, the payment would not be recorded on the ledger, but only in the duplicate cash receipts book. Money from the office ledger was placed in a cash box. "NOL" funds, however, were placed loose in an office desk drawer. "NOL" funds were routinely converted to cash and taken from the office to the doctor's home and placed in the inside coat pocket of an old grey coat kept in a clothes closet. A notation on the amount of "NOL" cash brought home was also kept in the coat pocket. Periodically, the cash would be taken up to the attic of the doctor's home and placed in one of three strongboxes maintained there.

Much of the government's proof was obtained from Jeanette Callahan, the doctor's ex-wife, who first divulged the "NOL" story to the IRS during a bitter divorce dispute with the doctor. Jeanette Callahan testified at the trial under a grant of immunity.

Callahan's defense did not dispute the government's basic factual case concerning the "NOL" scheme but sought instead to shift all criminal culpability for the scheme to his ex-wife. Callahan testified that Jeanette handled all business aspects of his practice while he merely practiced medicine. According to Callahan, Jeanette set up and managed all his business records. At Jeanette's request, Callahan "randomly" placed "NOL" on certain patient cards. Callahan

claimed he had no idea that the cash that found its way to the attic strongboxes via the old grey coat was not being recorded for tax purposes. Not surprisingly, the jury found this defense unconvincing.

On appeal, Callahan challenges several aspects of the court's charge to the jury, argues that it was improper for the court to encourage juror questioning of witnesses, and claims that the presentation and examination of certain witnesses were improperly restricted. Finally, the appellant asserts that the cumulative impact of the court's various errors deprived him of a fair trial.

## II. THE JURY CHARGE

### A. *The Elements of Tax Evasion*

To convict a person for criminal tax evasion under 26 U.S.C. § 7201, the government must prove three elements: "willfulness; the existence of a tax deficiency, . . . and an affirmative act constituting an evasion or attempted evasion of the tax." *Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965). The appellant claims that the court's instructions to the jury failed to include the requirement of an affirmative act.

The court specifically stated to the jury that: "[t]he prosecution must prove beyond a reasonable doubt that this defendant willfully attempted to evade or defeat a tax due the government. This involves the specific intent to evade the tax and some willful commission or omission or affirmative action by the defendant in furtherance of that intent." At another point in the charge the court stated that conviction under the evasion statute required "some act willfully done" to evade the tax. The appellant's allegation that the court failed to require the showing of an affirmative act is flatly contradicted by the record.

### B. *"Willful Blindness"*

It was clear at Dr. Callahan's trial that his tax returns substantially understated his income for each of the five years

between 1971 and 1975. The only issue was whether the understatement was knowing and willful. The court's elaborate instructions to the jury on knowledge and willfulness included the statement:

Now speaking further about knowledge, the element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond a reasonable doubt of conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact. It is entirely up to you as to whether you find deliberate closing of the eyes and the inferences to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.

The appellant asserts this portion of the charge incorrectly permitted the jury to draw an inference of knowledge from evidence of "willful blindness", "conscious purpose to avoid enlightenment" and "deliberately closed his eyes to what would otherwise have been obvious." However, we find the instruction indistinguishable from the language approved by this court in *United States v. Evans,* 559 F.2d 244, 246 (5th Cir. 1977).

*Evans* upheld an instruction which stated that " 'a person who makes a statement with reckless disregard of the truthfulness of the statement and with the conscious purpose to avoid learning the truthfulness of the statement, is deemed to have knowledge of this statement.' " 559 F.2d at 246. *Evans* quoted with approval the statements in *United States v. Sarantos,* 455 F.2d 877, 881 (2d Cir. 1972), that an individual may not circumvent criminal sanctions "merely by deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct," and that "construing 'knowingly' in a criminal statute to include wilful blindness to the existence of a fact is no radical concept in the law."

Although cast in different verbal garb, the phrases "willful blindness," "conscious purpose to avoid enlightenment" and "deliberately closed his eyes to what would otherwise have been obvious" convey the same meaning as the " 'reckless disregard of . . . and . . . conscious purpose to avoid learning the [truth]' " standard in *Evans.*

Callahan argues that deliberate avoidance of knowledge of a fact should be criminally culpable only when it is coupled with proof of actual subjective awareness of the high probability of the fact's existence, relying on *United States v. Valle-Valdez,* 554 F.2d 911, 914 (9th Cir. 1977). In *Valle-Valdez,* the defendant was apprehended while driving an automobile owned by someone else across the Mexican border with 667 pounds of marijuana in the trunk. The Ninth Circuit reversed the defendant's conviction because the trial court had instructed the jury that it could find the defendant guilty if he "acted with a conscious purpose to avoid learning the truth of the contents of the vehicle." 554 F.2d at 913. The court held that the jury should also have been required to find "that the defendant was aware of the high probability that the vehicle carried contraband." *Id.* at 914.

The appellant's reliance on *Valle-Valdez* is misplaced. Valle-Valdez did not own the car involved. So far as the proof disclosed, the trunk was never opened in his presence. Under these circumstances, the court held the prosecution had to show that Valle-Valdez knew it was highly probable that marijuana was in the trunk before his conscious avoidance of knowledge of its contents would be incriminating. Along that same line of reasoning, the jury here was not told that Callahan could be convicted merely because he closed his eyes to the errors on his tax returns. Rather, it was told that if the tax avoidance scheme "would otherwise have been obvious" he could not avoid criminal culpability merely by deliberately closing his eyes to it. The facts of the two cases are also inapposite. It is far easier to imagine innocent ignorance of the contents of an automobile trunk than innocent igno-

rance of dual receipt books, the "not on ledger" notations, the cash and records that were stuffed in Callahan's coat pocket at home, and the thousands of dollars that were secreted in his attic. The requirement that Callahan's willful blindness be a failure to see illegal activity that would otherwise have been obvious supplies here what was found substantially lacking in *Valle-Valdez.* Callahan cannot complain that the exact language of *Valle-Valdez* or our own *Evans* decision was not followed in his case. The instruction given correctly conveyed the essential principle that if Callahan was really ignorant of the "NOL" scheme and its resultant errors on his tax returns, he could not be criminally liable unless his ignorance was a conscious and purposeful effort to avoid knowing the obvious truth. *See United States v. Cook,* 586 F.2d 572 (5th Cir. 1978); *United States v. Restrepo-Granda,* 575 F.2d 524, 528–29 (5th Cir. 1978).

### C.  *Fraud and Negligence*

■ The appellant asked the trial court to give a specific instruction delineating the difference between fraud and negligence. The proffered instruction read in pertinent part:

> Negligence and fraud are not identical either in their nature or effect. Negligence is the absence of proper attention to duty, but fraud is always a positive and willful device, resorted to with a specific criminal intent in some manner in which the mind concurs with the act.

> A false return is not necessarily a fraudulent one. It may be merely incorrect, due to negligence or some other cause lacking intent, such as an honest mistake. Fraud is never presumed but must be determined from clear and convincing evidence, considering all the facts and circumstances.

The instructions that were given by the trial court completely and accurately described the distinction between fraudulent tax evasion and negligent or good faith failure to pay taxes due. The instructions included the following statements:

> The word knowingly means that the act or omission was done voluntarily and intentionally and not because of mistake or accident.  .  .  .

> A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.  .  ·.  .

> Now the attempt to evade or defeat the tax must be a willful attempt, that is to say it must be an attempt made voluntarily and intentionally and with the specific intent to keep from the government a tax imposed by the income tax laws which it was the legal duty of the defendant to pay to the Government and which the defendant knew it was his legal duty to pay. In other words, the attempt must be made with the bad purpose of willfully seeking to defraud the Government of some substantial amount of income tax lawfully due from the defendant.

> I have already defined the word willfully for you. Let me further point out to you that as applied to the income tax criminal statute, willfulness is a state of mind in which the defendant taxpayer is fully aware of the tax obligation which he seeks to conceal. Willfulness under the tax laws requires an intentional rather than an inadvertent act or omission and that willfulness must be characterized by a specific intent to conceal in contrast to a genuine misunderstanding of the law's requirements or a good faith belief that certain income is not taxable.

If anything, the trial court's instructions went further than the appellant's proffered charge by repeatedly emphasizing the requirement of knowing and willful evasion of tax liability. The instructions made it clear to the jury that it could not convict Callahan if it believed that his failure to report all his income was merely the result of negligence.

### D.  *Character Evidence*

A more serious allegation of error regarding the trial court's jury instructions concerns the instruction on character evidence. The instruction given was:

> The defendant, ladies and gentlemen, has introduced what is known as charac-

ter evidence. That evidence as to character is properly before the jury, not as a reason to acquit the defendant if you think he is guilty but to be considered along with all the other evidence in the case in determining whether you think he is guilty or not. Good character is a positive, substantive fact and may of itself be sufficient to generate in your minds a reasonable doubt as to the guilt of the defendant so as to require an acquittal, although without it the other evidence would be convincing as to guilt. If you should think from all the evidence that in spite of the evidence of good character the defendant did what he is charged with doing, then you ought to convict him. In other words, a jury would not be authorized to acquit merely because of good character. Character evidence is to be considered along with all the other evidence in determining whether the defendant did what he is charged with doing.

The appellant argues that the charge implies that jurors must disregard good character if other evidence points to guilt, emphasizing the sentence which states:

If you should think from all the evidence that in spite of the evidence of good character the defendant did what he is charged with doing, then you ought to convict him.

The appellant's argument requires an evaluation of four prior decisions in this circuit: *United States v. Leigh,* 513 F.2d 784 (5th Cir. 1975); *United States v. Furr,* 528 F.2d 578 (5th Cir. 1976); *United States v. Lange,* 528 F.2d 1280 (5th Cir. 1976); and *United States v. Harris,* 533 F.2d 306 (5th Cir. 1976).

*Leigh* is the initial case in the series which the three subsequent decisions all purported to follow. The court in *Leigh* struck down a character evidence charge because it included the following sentence:

However, evidence of good reputation should not constitute an excuse to acquit the defendant if you, the jury, after weighing all of the evidence in the case, is convinced beyond a reasonable doubt

that the defendant is guilty of the offenses charged in the indictment.

513 F.2d at 785. The court found that the sentence was an erroneous statement of the law because, "[s]eizing on this sentence, the jury could easily have formed the impression that reputation evidence could only be used to tip the scales in defendant's favor if the case was otherwise close; this is precisely the contention rejected by the Supreme Court in [*Edgington v. United States,* 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1897)]." 513 F.2d at 786. The *Leigh* court further zeroed in on the precise fault in the offending sentence by explaining that the phrase " '*after* weighing all of the evidence in the case' " conveyed the impression that character evidence was merely a tie-breaker to be used only if the case was close and when all other evidence was weighed. The court found that the error in the sentence was exacerbated by the fact that it gained emphasis by being placed last in the instruction, and by its use of the word "excuse," a word which implied "that if the jurors let the defendant go free on the basis of such evidence, they would be 'excusing' his commission of the crime rather than 'acquitting' him of it." 513 F.2d at 786.

■ *Leigh* stands for the proposition that a character evidence charge is erroneous if it could lead a jury to believe that character evidence is to be segregated from other evidence in the case and used only to tip the scales if that evidence is otherwise close. *Leigh* explicitly stated the correct rule:

[I]n charging that reputation evidence alone may create a reasonable doubt as to a defendant's guilt, [the trial judge] more than met the minimum content requirement for such a charge in this Circuit; that reputation evidence, considered together with all other evidence, may create such a doubt.

513 F.2d at 785, *citing United States v. Fontenot,* 483 F.2d 315, 323 (5th Cir. 1973); *United States v. Ramzy,* 446 F.2d 1184 (5th Cir. 1971), *cert. denied,* 404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d 544; *United States v. Cashio,* 420 F.2d 1132 (5th Cir. 1969), *cert.*

*denied,* 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420. *Leigh* thus drew a distinction between instructions which properly require character evidence to be considered along with all other evidence and instructions which relegate character evidence to a subsidiary role by allowing its consideration only after all other evidence is separately weighed. *Leigh* expressly approved the rule that it is proper to explain to the jury that character evidence is to be "considered together with all other evidence." 513 F.2d at 785.

In two decisions subsequent to *Leigh,* this court affirmed the distinction made in *Leigh. United States v. Furr,* 528 F.2d 578 (5th Cir. 1976), involved an instruction which was substantially identical to the *Leigh* instruction, but with the inclusion of one additional phrase:

> However, evidence of good reputation should not constitute an excuse to acquit a defendant if you, after weighing all of the evidence, *including the evidence of good character,* are convinced beyond a reasonable doubt that the defendant is guilty of the crime charged in the indictment.

528 F.2d at 579. The court held that the addition of the phrase "including evidence of good character" removed the vice of the *Leigh* charge because it eliminated the impression that character evidence was different from other evidence and could be used only to tip the scales if the case was otherwise close. *Id.* at 580. The *Furr* opinion also noted that the word "excuse" was a "troubling" term that should be avoided, but held that its inclusion was not reversible error.

*United States v. Lange,* 528 F.2d at 1280 (1976), decided only ten days after *Furr,* reached the same conclusion as *Furr* by the same reasoning, though it did not cite the *Furr* decision. *Lange* involved exactly the same instruction language used in *Furr. Lange* reasoned identically with *Furr* that the inclusion of the phrase "including evidence of good character" distinguished the language from *Leigh.* 528 F.2d at 1287 n.12. As did *Furr, Lange* expressed disap-

proval of "the troublesome 'excuse' language." *Id.* at 1287 n.12. Thus, *Furr* and *Lange* present independent interpretations of *Leigh* that endorse the distinction between telling the jury to consider character evidence after considering the other evidence and telling the jury to consider character evidence together with all the other evidence.

Two months after *Furr* and *Lange* were decided, another panel of this court decided *United States v. Harris,* 533 F.2d 306 (5th Cir. 1976). Again the exact language approved in *Furr* and *Lange* was used by the trial court. The *Harris* opinion quoted the instruction and then made a one-sentence holding: "On the authority of *United States v. Leigh, supra,* the conviction is reversed." 533 F.2d at 307. *Harris* did not discuss, analyze or explain *Leigh* in any way, nor did it cite *Furr* and *Leigh* or attempt to explain its direct conflict with those opinions.

The charge given in this case is *not* the same charge treated in *Harris, Furr* and *Lange.* The charge here does not use the word "excuse" and is far more elaborate than the *Harris-Furr-Lange* charge in its repeated emphasis of the principle that character evidence is to be treated together with all other evidence and not segregated merely to tip the scales. The charge states that character evidence "is to be considered with all the other evidence in the case in determining whether you think he is guilty or not." It emphasizes that "[g]ood character is a positive, substantive fact and may of itself be sufficient to generate in your minds a reasonable doubt as to guilt." Even the sentence singled out by Callahan (which reads, "If you should think from *all* the evidence that *in spite of the evidence of good character* the defendant did what he is charged with doing, then you ought to convict him.") clearly preserves the idea that good character is to be considered together with all other evidence. That sentence and the sentences that precede it plainly set forth the correct legal rule: good character should be considered together with all other evidence in a case and may of itself give rise to a reasonable doubt.

We decline to read *Harris* as intending to modify the long-standing rule that it is permissible to tell a jury that character evidence is to be considered together with all other evidence in a case to determine guilt. That principle has existed since the Supreme Court's 1896 decision in *Edgington*, which was endorsed in *Leigh* and repeated in *Lange* and *Furr*. Because *Harris* relied exclusively on *Leigh* and contained no discussion or analysis, it obviously did not change that principle. While *Harris* may be said to be inconsistent with *Lange* and *Furr* and the correct rules set forth in *Leigh*, it is phrased in language considerably different from that used here and is not controlling here. Since the instruction on character evidence given in today's case makes it clear that such evidence should be considered together with all other evidence in a case, it was correct.

One final observation is appropriate. Our lengthy analysis in this case would have been obviated had the district court given the pattern instruction on character evidence that is set forth in the manual of pattern instructions adopted and published by the District Judges Association of this circuit.[1]

## III. QUESTIONING BY JURORS

Before the opening statements of counsel began, the trial court told the jury that if any juror would like to have a particular question asked of a witness during his testimony, the juror should write the question out and have it passed up to the judge. The judge said that if the question was not legally improper, he would put the question to the witness. The judge explained that he did not want to encourage jurors to ask large numbers of questions but that they should not hesitate to ask a question if they felt that there was something they needed to know from a witness and the lawyers or the court had not brought it out. Only one question from a juror was actually submitted at the trial; the question asked for the date on which Callahan first found out that the IRS was checking on him. Callahan claims that the procedure of encouraging jurors to ask questions invades the province of trial counsel and distorts the proper roles of counsel, judge and jury.

There is nothing improper about the practice of allowing occasional questions from jurors to be asked of witnesses. If a juror is unclear as to a point in the proof, it makes good common sense to allow a question to be asked about it. If nothing else, the question should alert trial counsel that a particular factual issue may need more extensive development. Trials exist to develop truth. It may sometimes be that counsel are so familiar with a case that they fail to see problems that would naturally bother a juror who is presented with the facts for the first time.

The single question submitted by a juror in this trial was relatively innocuous and could have had no measurable impact on the outcome. There was no error committed in allowing the question to be asked, and the procedure employed of requiring jurors to put their questions in writing and clear their relevancy with the court was not an abuse of the court's discretion to conduct the trial fairly.[2]

---

1. The pattern instruction reads:

    Where a Defendant has offered evidence of good general reputation for truth and veracity, or honesty and integrity, or as a law-abiding citizen, the jury should consider such evidence along with all the other evidence in the case.

    Evidence of a Defendant's reputation, inconsistent with those traits of character ordinarily involved in the commission of the crime charged, may give rise to a reasonable doubt, since the jury may think it improbable that a person of good character in respect to those traits would commit such a crime.

    The jury will always bear in mind, however, that the law never imposes upon a Defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

2. The proper handling of juror questions is a matter within the discretion of the trial judge. *See United States v. Witt*, 215 F.2d 580, 584 (2d Cir. 1954). A procedure similar to the one employed in this case was held not to be error in *United States v. Gonzales*, 424 F.2d 1055 (9th Cir. 1970). Although no error occurred in this case, this opinion should not be read as an endorsement of any particular procedure. Dis-

## IV. RESTRICTIONS ON WITNESSES AND CROSS–EXAMINATION

### A. *The State Judge Character Witness*

██ Late in the afternoon on one of the final days of the trial, Callahan's defense counsel announced that his next witness "is a Judge and he is just completing a trial." The reference was to Judge Paul C. Armitage, a Superior Court Judge from Houston County, Georgia, who Callahan intended to use as a character witness on his behalf. Judge Armitage had not yet arrived in the courtroom, so the defense called Callahan to the stand and direct examination of the doctor began. When Judge Armitage did appear, the trial court called for a bench conference. The court questioned the propriety under the Georgia Code of Judicial Conduct of a judge testifying in a trial as a character witness. He indicated that he wished to discuss the issue in chambers, and then required defense counsel to continue his direct examination of Callahan. The direct examination was concluded and the jury was excused for the day.

In chambers the court then began an inquiry into the circumstances surrounding Judge Armitage's appearance. The court acknowledged that Judge Armitage was under an official subpoena, but questioned whether the subpoena was merely an excuse concocted to legitimize what was really a voluntary appearance. The following colloquy between the court and defense counsel then took place:

Mr. Garland: I object to this procedure with a defense witness.

The Court: You may object. Your objection is noted.

Mr. Garland: The fact that I have him under subpoena, Judge, I don't think gives this Court a right to conduct such an inquiry.

The Court: Well there's a difference of opinion. I think there is an obligation on the Court to determine the propriety of judges of other courts coming in and injecting the power of their public office into a proceeding in another court.

Mr. Garland: I object to this Court's comments because it is intimidating this witness. This Court has a tremendous power and the act of doing that will chill my ability to present witnesses. The fact that a man is a judge doesn't remove him from the right to be a witness. I ask Your Honor not to do it.

The court resolved the problem by leaving the choice to Judge Armitage himself:

THE COURT: The basic question, Judge, is whether you are here because [you] are subpoenaed or because of your relationship with the doctor and that telephone call, the subpoena not having arrived until 4:00. Now if you are here on an arms length subpoena you may testify but you are going to have to make that decision and I think I have the duty to call that Canon of Ethics to your attention which is right there in 231 Georgia Reports. You make the decision but if you are here voluntarily and that subpoena is just an excuse to comply with the ethics I suggest you ought not to testify and if you are here as the result of an arms length subpoena you ought to testify. You make the decision and those ethics are up to you.

The next morning Judge Armitage did not appear in court to testify. The appellant argues that the court intimidated Judge Armitage and thus deprived Callahan of a valuable character witness.

Canon 2 of the Georgia Code of Judicial Conduct provides that a judge "should not testify voluntarily as a character witness." The Commentary to Canon 2, however, states the caveat that the Canon "does not afford him a privilege against testifying in response to an official summons."[3] The

---

trict courts must in each case balance the positive value of allowing a troubled juror to ask a question against the possible abuses that might occur if juror questioning became extensive.

**3.** The Georgia Code of Judicial Conduct was adopted by the Supreme Court of Georgia on January 1, 1974. It is published in 202 S.E.2d at XXXIII, 231 Ga. at A–2. Canon 2 reads:

trial court below had no power to bar Judge Armitage from testifying under a subpoena. The subpoena was legal and valid on its face; as the official summons of the United States District Court it absolved and insulated Judge Armitage from any violation of the Judicial Canons. The court's concern about the possibility of an impropriety on Judge Armitage's part should have been handled by the initiation of appropriate action before local bar authorities. See Code of Judicial Conduct for United States Judges, Canon 3(B)(3).[4]

On the record before us, however, it appears that the trial court did little more than provide a gratuitous lecture on its own interpretation of the Judicial Canon. The court did not bar the testimony of Judge Armitage but let the Judge himself decide whether to testify. As a practical matter, Judge Armitage's testimony as a character witness would have had to have been "voluntary," subpoena or no subpoena. Callahan could issue a summons which would command the witness' appearance, but he could not by dint of the subpoena force the witness to speak well of him. The decision on whether to commend a defendant's character will always be "voluntary" in that sense. Obviously, Callahan would not have subpoenaed Judge Armitage unless he ex-

pected the Judge's cooperation. Nothing the trial judge said barred Judge Armitage from reaching his own decision on whether he wished to lend the prestige of his office to Callahan's defense. Although we do not approve of the trial court's actions in scrutinizing the Judge's decision, the fact that the decision was finally left solely to the witness prevented the mistake from rising to the level of reversible error.

### B. The Cross-Examination of Jeanette Callahan

▬▬ On cross-examination of Callahan's ex-wife, defense attorneys attempted to inquire into monetary demands on the doctor made by Jeanette Callahan's attorney during the pendency of her divorce suit. The purpose of the questioning was to show Jeanette Callahan's interest and bias. The court refused to permit cross-examination concerning divorce demands by Jeanette Callahan's attorney, but it did permit examination in other areas that amply exposed the bias of the doctor's ex-wife. The defendant's counsel was instructed that the court would permit Jeanette Callahan to be questioned on demands she personally made on the defendant, as well as any vindictive actions she took in reporting the doctor's activities to the IRS. Counsel was allowed

---

CANON 2

*A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities.*

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

*Commentary*

Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restric-

tions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

The testimony of a judge as a character witness injects the prestige of his office into the proceeding in which he testifies and may be misunderstood to be an official testimonial. This Canon, however, does not afford him a privilege against testifying in response to an official summons.

4. The situation of a judge testifying as a character witness is discussed in Advisory Opinion No. 9 of the Interim Advisory Committee on Judicial Activities, Code of Judicial Conduct for United States Judges at II–21. The Advisory Opinion treats the ethical conflicts posed by such testimony as matters to be resolved by the witness-judge, not the trial court. The opinion unequivocally states that "if subpoenaed, a judge must respond to the subpoena." As we note in the text, however, a trial judge who believes that a judge who appears as a witness in his court has acted improperly has an obligation under the Canons to initiate disciplinary action before appropriate bar authorities.

to ask whether Jeanette Callahan had stated that "she would rather see Dan Callahan dead or in jail" and whether she was "demanding $48,000 a year or else [she] would go to the IRS." Jeanette Callahan's prejudice was also evidenced by her obviously bitter divorce from the doctor, her formal grant of immunity, and her admitted complicity in the "NOL" scheme. The divorce papers were in evidence, and the prosecutor himself admitted in his closing argument that Jeanette was biased against her ex-husband. It was within the court's discretion to limit this one area of questioning concerning demands by Jeanette Callahan's attorney in view of Jeanette Callahan's amply established antagonism to her former husband.

## V. CONCLUSION

The government assembled a strong factual case against Callahan. The appellant claims, however, that at trial the government received too much help from the court. The appellant asserts that even if no single action by the trial court rises to the level of reversible error, their cumulative impact warrants reversal of his conviction. We have rejected, however, virtually every allegation of error presented on this appeal. There are no legal errors of any substance to total on Callahan's behalf.

The appellant's conviction is

AFFIRMED.