UNITED STATES of America,
Plaintiff-Appellant,

v.

Gertrude King BLACK and Bill Black,
Defendants-Appellees.

No. 79–2535.

United States Court of Appeals,
Fifth Circuit.

May 4, 1981.
Rehearing Denied July 23, 1981.

**446**

Morris W. Reed, Robert J. Boitmann, Asst. U. S. Attys., John P. Volz, U. S. Atty., New Orleans, La., for plaintiff-appellant.

Matthew H. Greenbaum, Michael S. Fawer, New Orleans, La., for defendants-appellees.

Before RUBIN, HENDERSON and REAVLEY, Circuit Judges.

HENDERSON, Circuit Judge:

Gertrude King Black and her husband, Bill Black, were charged in a nine-count indictment with making false statements to a federal agency in violation of 18 U.S.C.A. §§ 1010 and 2, embezzling money belonging to the United States in violation of 18 U.S. C.A. §§ 641 and 2, and perjury before a federal grand jury in contravention of 18 U.S.C.A. § 1623. The case was tried before a jury in the United States District Court for the Eastern District of Louisiana. At the close of the government's case, and again at the close of all evidence, the defendants moved for a judgment of acquittal. On both occasions, the district judge reserved ruling. The jury returned a guilty verdict on all but one count, whereupon the trial court granted the motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29(b). The government appeals this ruling. We affirm in part and reverse and remand in part.

## APPEALABILITY OF THE JUDGMENT OF ACQUITTAL

As an initial matter, we must deal with the Blacks' contention that the trial court had *de facto* granted their motion for judgment of acquittal prior to the announcement of the verdict, thereby precluding the government's appeal. *See United States v. Burns,* 597 F.2d 939 (5th Cir. 1979). In response to the first request for judgment of acquittal, the judge declared the government's presentation "as weak a case as I've ever see," but nevertheless took the motion under advisement. When the motion was renewed at the close of all evidence, the judge advised counsel that he believed there was "no substantial evidence on which a reasonable person could return a verdict of guilty." He then continued:

> However, I think having gone this far and having submitted the ladies and gentlemen of the jury to a week of listening to the testimony, that the best interest of justice at this stage would be for the Court to reserve ruling and allow the parties to submit the case to the jury.

R. 874–75.

After deliberating for 4½ hours, the jury acquitted the Blacks on Count Five, but returned guilty verdicts on all remaining counts. The trial judge immediately granted the motion for acquittal, explaining:

> At the time the Court came out, the time the Court came out fifteen minutes ago, I had concluded that I would render the rulings on the motions that I therefore (sic) reserved. I did not do so because of the message that I had related to the parties that the marshal gave me that the jury was about to decide. I, of course, had no way of knowing what the jury's decision is.
>
> As I explained after the close of all the evidence when the motions were made, I felt that these jurors, having invested this much time, should be given the opportunity to decide the case; and I, therefore, gave them that decision. But, as I also stated at that time, I had a little doubt as to any of the counts that there was no substantial evidence to justify a reasonable person concluding guilt beyond a reasonable doubt.

R. 955–56. These comments form the basis for the Blacks' assertion that the acquittal was actually granted prior to the verdict, and that only the formal announcement of the ruling was delayed until after the jurors completed their deliberations.

The government, on the other hand, maintains that the court granted the motion *nunc pro tunc,* and that the appeal is allowable under 18 U.S.C.A. § 3731 just as if the judgment of acquittal had been

granted after the jury's verdict. We find this position more tenable. "Since reversal would require only the reinstatement of the guilty verdicts of the fact finder and Appellees would not be subjected to a new trial, the Government may appeal." *United States v. Burns*, 597 F.2d at 940. *See also United States v. Scott*, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978); *United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975); *United States v. Clemones*, 577 F.2d 1247 (5th Cir. 1978); *United States v. Boyd*, 566 F.2d 929 (5th Cir. 1978).

## FACTUAL CONTEXT

The charges against the Blacks arose out of Mrs. Black's stewardship of two housing projects under the jurisdiction of the Department of Housing and Urban Development (hereinafter referred to as HUD). In April of 1974, Mrs. Black was requested by HUD to take over as the managing agent of the Townhouse Apartments in Gretna, Louisiana. At HUD's recommendation, she was appointed temporary receiver in May of 1975. HUD acquired ownership of the project in March, 1976, and Mrs. Black was again asked to serve as managing agent. She agreed, and signed a new contract with the government in July of 1976.

On May 1, 1974, HUD entered into a 30-day interim contract with Mrs. Black for the management of the Villa D'Ames Apartments located in Marrero, Louisiana. A permanent agreement for the management of this project was executed on June 1, 1974.

## SUFFICIENCY OF THE EVIDENCE

■ In evaluating the propriety of the district court's decision to grant the motion for judgment of acquittal, we must inquire "whether the jury might reasonably conclude that the evidence, viewed in the light most favorable to the prosecution, is inconsistent with every reasonable hypothesis of the accused's innocence." *United States v. Fredericks*, 586 F.2d 470, 474 (5th Cir. 1978). Or, to rephrase this standard, we must ascertain whether the trial judge correctly performed the following task:

> The District Court must determine whether the relevant evidence, viewed in the light most favorable to the Government, could be accepted by a reasonably-minded jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. The same test applies whether the evidence is direct or circumstantial. All reasonable inferences which tend to support the Government's case must be accepted. Any conflicts in the evidence must be resolved in the Government's favor.

*United States v. Burns*, 597 F.2d at 941 (citations omitted). With this test in mind, we examine the sufficiency of the evidence as to the counts upon which the jury found Mr. and Mrs. Black guilty.

### Counts One, Two and Three

Counts One, Two and Three charge Mrs. Black alone and allege that, in connection with her management of the Townhouse Apartments, she made materially false statements in her monthly reports to HUD in violation of 18 U.S.C.A. §§ 1010 and 2.[1] In order to obtain a valid conviction as to each alleged offense, it was necessary for the government to prove beyond a reasonable doubt that Mrs. Black knowingly made a false statement concerning a material fact to HUD as charged in the indictment, and that she made the false statement wilfully and for the purpose of influencing the actions of HUD. *Gevinson v. United States*, 358 F.2d 761 (5th Cir. 1966). *See also United States v. Lange*, 528 F.2d 1280 (5th Cir. 1976).

---

1. 18 U.S.C.A. § 1010:

    Whoever, ... for the purpose of influencing in any way the action of [HUD], makes, passes, utters, or publishes any statement, knowing the same to be false ... shall be fined not more than $5,000 or imprisoned not more than two years, or both.

    18 U.S.C.A. § 2:

    (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

    (b) Whoever wilfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Upon signing the July, 1976 contract in which she agreed to serve as managing agent for Townhouse, Mrs. Black hired Charles Donewar as resident manager. Donewar's duties included collecting rents, paying bills, and preparing the monthly Manager's Summary Accounting Reports which were required to be sent to HUD. The monthly report submitted for July of 1976 revealed that disbursements exceeded collections by $2,073.39. This figure was placed in a space on the accounting form marked "amount due manager." As a result, HUD issued Mrs. Black a reimbursement check in this amount. Mrs. Black signed the July report, but made no changes in or additions to its contents. She also signed the accompanying Cash Reconciliation Report for July 1976. This report listed as outstanding three checks totaling $2,113.16. As part of its proof, the government produced a bank statement dated July 31, 1976, which disclosed that the three checks had, in fact, cleared the account as of that date and were not outstanding.

The Manager's Summary Accounting Report for August 1976 showed an excess of disbursements over collections of $4,575.79. Here again, this figure appeared in the "amount due manager" space, and HUD issued a reimbursement check. Mrs. Black did not sign the August report.

The two checks, totaling $6,649.18, were deposited in the Townhouse Apartments regular checking account. Shortly thereafter, this exact amount was removed from the Townhouse account and transferred to Mrs. Black's personal business account by means of Townhouse Apartments check no. 1477. This check bore her signature. On the December 1976 Manager's Report of Disbursements, check no. 1477 was listed as "VOID."

In late 1976 or early 1977, the New Orleans Area Office of HUD requested a routine audit of the Townhouse Apartments. The auditor found no indications that Mrs. Black had advanced any of her own funds to the project.

According to the government, the Manager's Summary Accounting Report and Cash Reconciliation Report for July (Count One) and the August Manager's Summary Accounting Report (Count Two) falsely represented that Mrs. Black had advanced money to the Townhouse project and that she was due reimbursement. The government seemed to take the position at trial that, since Mrs. Black's supervision began only in July, and since she admitted not having advanced personal funds to Townhouse, she could not possibly have expended more cash than was collected during the months of July and August. However, Mrs. Black testified that, at the time she assumed the operation of the project pursuant to the 1976 contract, there was approximately $7,000.00 in the Townhouse account which had carried over from the receivership period. This testimony was corroborated by William Baptist, an accountant called as an expert witness by the defendants. His examination of Townhouse bank records revealed that, as of March 31, 1976, the Townhouse account which Mrs. Black controlled contained $7,100.00. The government apparently never sought to determine whether expendable funds existed at the time she took over as managing agent.

The problem still remains, however, that Mrs. Black received reimbursements for the months of July and August to which she admittedly was not entitled. These payments from HUD were a result of the manner in which Donewar completed the Manager's Summary Accounting Reports. The collections and disbursements which Donewar reported were, we assume, correct. However, by utilizing the "amount due manager" space for reporting the negative balances, he caused HUD to issue the reimbursement checks. When questioned as to his motives, Donewar maintained that the form supplied by HUD required that he report the balance either as "amount due manager" or "amount due FHA." In the latter case, he would be expected to send the disclosed amount to the Federal Housing Administration.

The actual appearances of the reports in question are substantially as follows:

July 31, 1976

| COLLECTIONS | $12,380.24 |
|---|---|
| DISBURSEMENTS | 14,453.63 |
| * BALANCE | $(2,073.39) |
| AMOUNT DUE FHA | $    00 |
| AMOUNT DUE MANAGER | $ 2,073.39 |
| * Show amount in brackets, if Disbursements exceed Collections. | |

August 31, 1976

| COLLECTIONS | $12,629.00 |
|---|---|
| DISBURSEMENTS | 17,204.79 |
| * BALANCE | $(4,575.79) |
| AMOUNT DUE FHA | \  00 |
| AMOUNT DUE BROKER | $(4,575.79) |
| * Show amount in brackets, if Disbursements exceed Collections. | |

Thus, it may be argued that, contrary to Donewar's asserted belief, the HUD form did provide a method for reporting a negative balance aside from the inclusion of such figure in the space marked "amount due manager." Indeed, in both reports Donewar complied with the instructions on the forms by enclosing the negative balances in parentheses.

The government's evidence was sufficient, then, to justify the jury's conclusion that false statements were made on the Manager's Summary Accounting Reports. Similarly, the July Cash Reconciliation Report listed as outstanding three checks which that month's bank statement disclosed as having cleared the account.[2] Our more difficult inquiry is whether the evidence, taken in the light most favorable to the government, sufficiently demonstrated guilty knowledge and a purpose to influ-

ence HUD on the part of Mrs. Black. Donewar testified that he personally prepared the accounting reports and performed the necessary calculations without any suggestions or instructions from his employer. He had no prior experience with HUD accounting procedures, and the July and August reports were among the first documents he prepared. Hence, he may have made mistakes. However, as managing agent, Mrs. Black was ultimately responsible for the veracity of the information supplied to HUD. She signed the July documents and, although it was stipulated that the signature on the August Manager's Summary Accounting Report was not hers, both she and Donewar testified that at least some of the reports were submitted to her for review.

The HUD realty specialist, Charles Fortier, stated that Mrs. Black received an accounting manual explaining the procedures to be followed in managing a HUD project when she entered into the original agreement. She also received a business guide for the operation of the project, and the HUD rules and regulations were made a part of the contracts. The evidence further established that Mrs. Black had been a licensed real estate broker since 1963. At the time she was managing the Townhouse Apartments, she was also in charge of four other multi-family housing projects. Each Manager's Summary Accounting Report form contained the pertinent language of 18 U.S.C.A. § 1010, as well as a paragraph above the signature block certifying the truthfulness of the report. The jury could, perhaps, infer from Mrs. Black's extensive administrative experience and the warnings and instructions given her that she knew, or but for total disregard for the truth would have known, that the July and August accounting reports contained false statements. Further, it could surmise that she permitted these statements to go uncorrect-

2. Although the trial court, while discussing with counsel the first motion for judgment of acquittal, discounted the significance of the inaccuracies in the Cash Reconciliation Reports, the inclusion of the three checks as outstanding liabilities yielded a deficit equal to the $2,073.39 claimed as "amount due manager" on the Summary Accounting Report. If these checks had been omitted from the outstanding column, the Cash Reconciliation Report would have revealed a slight surplus in the account.

ed for the purpose of influencing the actions of HUD. *Cf. United States v. Lange*, 528 F.2d 1280 (5th Cir. 1976) (defendant's limited education, his administrative inexperience and the absence of warnings of possible criminal penalties for misstatements were to be weighed in determining criminal intent).

Similar observations may be made with respect to the listing of check no. 1477 as void on the December 1976 Manager's Report of Disbursements (Count Three). Donewar testified that, during that month, he discovered $6,649.18 in the Townhouse account which was not attributable to rent collections. Not realizing that this amount equaled the sum of the two reimbursements checks issued by HUD for the months of July and August, he telephoned Mrs. Black and expressed his opinion that the bank erroneously deposited the money in the Townhouse account rather than in Mrs. Black's business account (a situation which had, indeed, occurred earlier) or, alternatively, that the amount represented funds which Mrs. Black had advanced to the project. He sent her a blank check and recorded the check number on the disbursements form. When Mrs. Black received the check, she prepared it in the amount which had been reported to her and deposited it to her business account. She then left for a Christmas vacation, and the carbon copy of the check remained in her office through the end of the month. Consequently, according to Donewar, when the time came to prepare the monthly report, he was not certain that the check had been utilized. Given this dilemma, he recorded check no. 1477 as "VOID" on the disbursements sheet. Again, Donewar testified that he alone was responsible for the relevant entries and that Mrs. Black did not instruct him in any way.

As previously mentioned, the HUD audit revealed no advancement of funds to the Townhouse project by Mrs. Black. At her initial conference with the auditor, she was asked whether anything unusual might appear in the Townhouse records. She responded that the auditor would find a

$6,000.00 loan which the bank had erroneously deposited to the account, and that this amount had been withdrawn because it rightfully belonged to her and her husband. When questioned about the same transactions at the conclusion of the audit, Mrs. Black explained that she had been told by Donewar and the resident manager who succeeded him that the money was transferred as repayment of an advance to the project.

In addition to these inconsistent explanations, the government's proof demonstrated that Mrs. Black herself deposited the reimbursement checks to the Townhouse account on November 22, 1976, only 20 days prior to the issuance on December 12, 1976 of check no. 1477. This time proximity tends to cost doubt on her claimed ignorance of the source of the $6,649.18. It is also noteworthy that the November, 1976 Cash Reconciliation Report represented that the ending bank balance for that month was $12,523.87, whereas the corresponding bank statement for the Townhouse account reflected a $17,523.87 balance.[3] The government maintains that this underreporting assisted in the concealment of the overage in the account. Had the correct ending balance been reported, Mrs. Black would have been expected to remit the excess funds to HUD.

From the cumulative evidence pertinent to Counts One, Two and Three, the jury could have reasonably concluded that Mrs. Black was remiss in the performance of her contractual duties to HUD, that she failed to exercise adequate supervision over her employees, and that she was careless and inattentive to bookkeeping matters. However, could the jury further have found, beyond a reasonable doubt, that she possessed the elements of specific intent necessary for a conviction under 18 U.S.C.A § 1010? This is a difficult question, but one which we believe requires an affirmative answer. Although the findings that Mrs. Black knowingly and purposefully caused false statements to be submitted to HUD

---

3. This purported false statement was not charged in the indictment.

are necessarily based on circumstantial evidence, and although the defensive theories are not totally implausible, we must conclude that the jury's resolution was one which it could properly make. "Weighing the sufficiency of the evidence in such a case does not depend upon whether 'in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis, but that of guilt, but rather whether the jury might reasonably so conclude.'" *United States v. Edwards*, 488 F.2d 1154 (5th Cir. 1974) (citation omitted). Hence, the district court erred in granting the judgment of acquittal on the first three counts.

### Counts Four, Six and Seven

The remaining counts in the indictment pertain to Mrs. Black's operation of the Villa D'Ames project. Counts Four, Six and Seven charge that either or both of the Blacks embezzled funds from Villa D'Ames in violation of 18 U.S.C.A. §§ 641[4] and 2. In order to establish violations of § 641, the government had to prove that the money described in the indictment belonged to the United States, and that the Blacks embezzled, stole or converted the funds to their own use and did so knowingly and wilfully with the intent to deprive the government of the benefit and use of the money.

As a broad challenge to all three counts, the Blacks maintain that the funds in the Villa D'Ames accounts did not belong to the United States. The government's interest in the project dates from 1971, when HUD guaranteed the loan for its construction. When the owners, the Christian Brotherhood, defaulted on the loan in 1973, HUD paid the mortgagee's claim and took an assignment of the mortgage. However, the government did not acquire legal title to the project until December 16, 1976, long after the alleged embezzlements occurred. This situation occasioned a strenuous debate, both at trial and on appeal, as to whether the rents deposited in the Villa D'Ames accounts constituted "money of the United States" for purposes of § 641. However, without delving into this primarily legal question, we conclude that the government failed to prove that the Blacks knowingly and wilfully embezzled Villa D'Ames funds.

In Count Four, the Blacks were charged with embezzlement and the conversion of $4,510.83 to their own use by transferring that amount from the Villa D'Ames checking account to Mr. Black's personal account. The ostensible purpose of this transaction was to repay Mr. Black, who owned a construction business, for materials which had been used to repair and restore the apartments. As Mr. Fortier, a HUD witness, confirmed on cross-examination, the Villa D'Ames project was in "deplorable" condition, fifty percent of the units being totally uninhabitable, when Mrs. Black took over as managing agent in May of 1974. Since HUD could not advance funds to the project, restoration had to be financed through existing rent collections or through an independent source. According to the Blacks, this situation prompted Mrs. Black to turn to her husband for the supplies needed to implement immediate repairs.

Unfortunately, Mrs. Black did not abide by the HUD procurement regulations, nor did she heed the conflict of interest provision of her contract. Specifically, she failed to submit vouchers, purchase orders and bids, and did not seek prior approval of the transaction with her husband. When HUD conducted an audit in October of 1977, the auditor became suspicious because he was unable to find any supporting documenta-

4. 18 U.S.C.A. § 641:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both....

Counts Four and Six charge both defendants with violations of the statute. Count Seven is aimed solely at Mrs. Black.

tion for the $4,510.83 disbursement. However, at the trial, Mr. Black testified in great detail concerning the material sent from his warehouse to Villa D'Ames. He also produced vouchers, which were admitted into evidence, to account for expenditures made to other suppliers for materials which did not come from his warehouse, but which he purchased for the project.[5] Nelson Schexnayder, a carpenter who supervised the disbursement and use of the materials obtained from the warehouse, testified that Villa D'Ames received supplies worth a total of approximately $3,500.00. Mr. Black explained that he arrived at the $4,510.38 figure by lowering Schexnayder's estimate to $3,100.00, "to be on the low side," and then adding the sum of the invoices, which amounted to approximately $1,400.00

Mr. Black submitted the bill to the Villa D'Ames resident manager, Theresa Borden, who then relayed the information to Mrs. Black so that she could insert that amount on the check. Both the identity of the payee and the amount of the check were clearly revealed on the May, 1974 report of disbursements. There is no evidence whatsoever to indicate that Villa D'Ames did not receive the materials which were purportedly supplied, or that the project was not actually benefited in the same amount for which Mr. Black was reimbursed.

Count Six alleges that the Blacks embezzled and converted to their own use $480.00 from the Villa D'Ames checking account. This count centers around a check made out to "Aristocrat Air Conditioning Company" which was deposited to Mrs. Black's personal business account without the endorsement of the payee. The Blacks explained that, in November of 1975, they received a call from the Villa D'Ames resident manager's office and were told that a tenant who

had been without air conditioning for a month was complaining to HUD. Bill Black contended that he talked with Michael Leaumont at Bryant Air Conditioning Company, a wholesale distributor, and was told that Aristocrat Air Conditioning Company, the retail dealer which the Blacks utilized, would need cash in order to purchase and install a replacement air conditioning unit. Mrs. Black retrieved $480.00 from her home, placed the money in an envelope, and delivered it to Park Village, another apartment complex she managed, where it was picked up by a workman from Aristocrat. Aristocrat then purchased and installed a unit, and the Blacks reimbursed themselves by drawing a $480.00 check payable to Aristocrat on the Villa D'Ames account and depositing it in Mrs. Black's personal business account.

Harold Logrande, the owner of Aristocrat, was called as a government witness. He testified that on several occasions his company had performed work at Villa D'Ames. His normal practice was to present his customers with a bill when the work was completed, and he did not remember ever having asked Mrs. Black for cash "on the spot." Logrande acknowledged his signature on a purchase order which represented to HUD that he had replaced a two-ton General Electric air conditioning unit at Villa D'Ames for the price of $480.00. He stated that his company never installed General Electric units, and would replace such units with either Bryant or Carrier brand air conditioners. Logrande also admitted signing an affidavit, at Mrs. Black's request, to the effect that he did receive $480.00 in connection with the installation of the unit. However, he testified that he simply could not recall whether he in fact installed the unit or received the $480.00.

5. Some of these vouchers were never turned over to the grand jury. Mr. Black's records were subpoenaed in October of 1978. He produced certain checks and receipts, but was unable at that time to locate all of the invoices pertaining to the Villa D'Ames repairs. He unexpectedly ran across the missing invoices around November 1, 1978, and brought these documents with him to the November 9th grand jury hearing. The transcript of Mr.

Black's testimony at the hearing indicates that the prosecutor had just begun to inquire about these records when a grand juror interrupted with another line of questioning. The prosecutor then broke into this exchange and advised Mr. Black that his testimony would have to be discontinued so that another witness could testify. Mr. Black then left the hearing, taking the documents with him.

He explained that he signed the affidavit because he had no records to contradict its assertions. His business records for the year 1975 had been destroyed in a flood. At the prosecutor's request, he checked with Bryant Air Conditioning Company and ascertained that it, also, had no records of a purchase by Aristocrat during that period. He testified further that, at the time of the transaction, the cost of the unit and the installation fee would have totaled precisely $480.00.

On cross-examination, Logrande stated that in November of 1975 his company was in the process of switching from Bryant to Carrier brand air conditioners. At that time, Carrier demanded cash payments and Aristocrat, in turn, required cash from its customers. There were many Aristocrat workmen, other than Logrande, who were authorized to obtain cash from customers and then purchase and install a unit. The affidavit, it was disclosed, did not represent that Logrande received a check from Villa D'Ames, but that "we did, in fact, receive the *proceeds* of Villa D'Ames check number 1844 ... in the amount of $480.00" (emphasis added). When questioned as to his personal opinion, Logrande avowed his belief that someone in authority at Aristocrat did receive $480.00 in cash and then purchased and installed a Carrier unit at Villa D'Ames.

On redirect examination, Logrande identified Michael Leaumont as an employee of Bryant Air Conditioning Company. He further stated that Aristocrat had an open account with that company and did not need cash to purchase a Bryant unit. Leaumont testified that he did not recall having a telephone conversation with Mr. Black, and that he would not have been in a position to disclose Aristocrat's credit status with Bryant. He did admit, however, to having heard occasional conversations about the credit-worthiness of certain of Bryant's dealers.

Schexnayder, the Blacks' carpenter supervisor, was also questioned regarding his knowledge of the air conditioner transaction. He stated on cross-examination that he had heard "through the office" that $480.00 was needed to purchase a unit, but that he was not personally involved in the acquisition. Schexnayder also signed an affidavit at Mrs. Black's request, the wording of which imparts the impression that he was directly involved in the purchase. However, he attempted to explain at the trial that he meant the personal pronoun "we" to refer to the company, and that, to the best of his knowledge, the statements contained in the affidavit were true.

We have referred to this testimony in some detail because, with respect to Count Six, especially, the government and the Blacks presented amazingly divergent characterizations of the evidence. Of the two, the Blacks' version seems more accurate. To be sure, the government did show confusion and discrepancies, particularly as to whether Aristocrat installed a Bryant or a Carrier unit. It also established, when the evidence is viewed in its favor, that Mrs. Black contravened HUD procurement regulations by purchasing an item costing in excess of $200.00 without prior approval. However, the government utterly failed to prove that the Blacks did not, in fact, expend $480.00 of their personal funds for the purchase of an air conditioner, or that they did not genuinely believe they were entitled to reimbursement in that amount. Again, this transaction was fully disclosed to HUD, and an invoice from Aristocrat and the purchase order were submitted along with the corresponding monthly report. As to the absence of an endorsement on the check, the Blacks claimed that the check was drawn after the cash had been picked up so that someone authorized by Aristocrat could endorse it back to them. The check was left at the project for three weeks, and when Aristocrat failed to act, Mrs. Black deposited it without the endorsement. As a matter of fact, the check, although drawn on November 29, 1975, was not deposited until December 22, 1975.

The government's proof also falls short on Count Seven, in which Mrs. Black is charged with embezzling $3,000.00 from the Villa D'Ames escrow account. On August 31, 1976, a check was issued transferring $3,000.00 from the Villa D'Ames account to Mrs. Black's payroll account. The $3,000.00

disbursement was discovered during the October 1977 audit, but the auditor was unable to determine why, or to whom, the check had been issued. When questioned, Mrs. Black told the auditor the money had been transferred to the Villa D'Ames regular account, but that she was unable to locate the check.

At that point, Mrs. Black began requesting the bank to send her a copy of the missing check. The documentary evidence confirms that she wrote three letters pursuing the matter, but that it was not until June of 1978 that the bank acknowledged receipt of her letters, apologized for the delay, and forwarded a copy of the check. Meanwhile, the audit was completed and, since the disbursement was still unsubstantiated, Mrs. Black issued a $3,000.00 check payable to HUD.

At the trial, Mrs. Black stated that, at the time of the audit, she could not remember why there had been a $3,000.00 disbursement from the escrow account. Her bank records disclosed that on the date of this disbursement, the Villa D'Ames regular checking account received a $3,200.00 deposit. Hence, she believed that the regular account had been the recipient of the money transferred from the escrow account.

The actual purpose of the transaction, as Mrs. Black testified at the trial, was to reimburse her business payroll account for $2,200.00 of withheld state income taxes and federal and state unemployment taxes which her company had paid on behalf of Villa D'Ames employees, and funds in excess of $800.00 which she had advanced to the project and for which she had never been repaid. Her testimony was corroborated by that of William Baptist, the accountant employed by the Blacks as an expert witness. Baptist recalled that he spent 16 hours examining the payroll records of Villa D'Ames and the Trudy Black Realty Company which covered the period from November 1974 through August 31, 1976.

He concluded that, as of the latter date, Villa D'Ames owed Mrs. Black $2,200.00 because her real estate company had remitted the withheld Louisiana income taxes and state and federal unemployment taxes for Villa D'Ames employees in that total sum. The checks issued from the company's payroll account were entered into evidence. Baptist also testified that he discovered three checks, totaling over $800.00, which were drawn on Mrs. Black's business account and made payable to Villa D'Ames. These instruments were also admitted into evidence. Baptist found no indication that Mrs. Black had been reimbursed for these sums prior to the issuance of the $3,000.00 check on August 31, 1976.

The government asserts that HUD auditor James Ward, who was recalled at the conclusion of the defense presentation, completely rebutted Baptist's testimony. Our examination of the transcript discloses that Ward made quite broad statements to the effect that Villa D'Ames did withhold some taxes on behalf of its employees. However, nowhere in his testimony did he directly refute the specifics of Baptist's findings.[6]

■ Having reviewed the evidence relating to the three embezzlement counts, we once again observe that the jury could have reasonably concluded that Mrs. Black did not faithfully adhere to the strictures of her contract with HUD; that she, as well as her husband, was less than meticulous in recording financial transactions; and that she failed to exercise adequate supervision and control over the affairs of Villa D'Ames. However, the leap of faith we took with respect to Counts One, Two and Three we cannot take here; we are unable to salvage the jury's verdict finding the Blacks guilty of the crime of embezzlement. The government's proof was insufficient to allow a reasonable jury to conclude beyond a reasonable doubt that the Blacks converted to their own use money to which they were not entitled, much less that they did so

6. The trial judge was of the same opinion, as is evident from his remarks to defense counsel outside the jury's hearing:

The Court: Do you really want to waste any time cross-examining?

Mr. Burk: I am not sure what he said.

The Court: He didn't say a damn thing. Why don't you let it go, there is no—he made such broad conclusionary statements put in his mouth that meant nothing.

R. 866–67.

knowingly and wilfully. The evidence of criminal intent is simply too meager. Hence, we affirm the judgment of acquittal as to these counts.

### Counts Eight and Nine

 In Count Eight, the government charged Bill Black with perjury before the grand jury in violation of 18 U.S.C.A. § 1623.[7] Count Nine consists of a similar charge against Mrs. Black. The declarations which were allegedly false pertain to the $480.00 transaction on which Count Six was based. Without further elaboration, we conclude that the government adduced insufficient proof that these statements were false, or that the Blacks made them knowing them to be false. Judgment of acquittal was proper as to these counts also.

For the foregoing reasons, the judgment is AFFIRMED in part, REVERSED in part and REMANDED with directions to reinstate the verdicts of guilty against Gertrude King Black on Counts One, Two and Three.

---

**7.** 18 U.S.C.A. § 1623(a):
Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both.