**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Gabriel Dejesus CARDENAS,**
**Defendant-Appellee.**

**No. 83–1720.**

United States Court of Appeals,
Fifth Circuit.

Dec. 17, 1984.

Rehearing Denied Feb. 1, 1985.

---

James A. Rolfe, U.S. Atty., Shirley Baccus-Lobel, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellant.

Max B. Kogen, Lauren Kogen, Miami, Fla., for defendant-appellee.

Before JOHNSON, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Gabriel Cardenas was convicted by a jury for possession of a controlled substance with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). The trial court, however, granted a post-verdict judgment of acquittal on the ground that there was insufficient evidence to support the jury's verdict. The government has appealed. Finding that the record does contain sufficient evidence to support the defendant's conviction, we reverse and remand the case for the reinstatement of the jury verdict of guilty.

## I.

The events which led to the arrest of the defendant Cardenas resulted from a fugitive investigation. The Federal Bureau of Investigation (FBI) had received information that Paul Alan Van Riessen, a fugitive charged in Oklahoma with conspiracy to import and conspiracy to distribute marijuana, was living in Texas.

The FBI's investigative efforts led them to a Dallas Cadillac dealer. From the dealer, the FBI learned that Van Riessen, along with another individual, Eula Mae Fulton, had recently purchased a red 1983 Cadillac El Dorado. The FBI also learned that the car was currently at the dealership for repairs. In an effort to locate Van Riessen, the FBI began surveillance of the red Cadillac after the vehicle was removed from the dealership on March 10, 1983.

The car was followed throughout the day. At approximately 8:15 p.m. Fulton drove the Cadillac to a house located in Rowlett, Texas, which had been rented in February of 1983 by Eula Mae Fulton and another female. The car was removed from the residence later that night by a male driver, not Van Riessen, and returned to the house at approximately midnight. The FBI maintained surveillance of the Rowlett residence the entire night and no activity was noted.

At approximately 9:30 a.m. the next morning, March 11, Fulton left the residence in the red Cadillac. The car was not followed, however, since no man was in the car, and the agents were searching for Van Riessen. Later that morning, the car was observed in the area of the residence. Eula Mae Fulton was driving the car with Cardenas as a passenger. The car did not stop at the residence. Rather, Fulton drove Cardenas around the area, and eventually brought him to a small shopping center near the vicinity of Belt Line Road and Interstate 30. Here, Cardenas exited the car and entered a grocery store which was adjacent to a Shell station and Spires Restaurant. He browsed through a magazine and book rack, then left the grocery store and walked to a nearby intersection. Cardenas walked back and forth in the vicinity of the intersection for approximately forty-five minutes.

Meanwhile, Fulton returned to the Rowlett residence, and picked up another man. She drove this unidentified individual to the Days Inn which overlooked the intersection where Cardenas was standing and pacing. This individual entered the restaurant at the Days Inn and sat near a window. This man is not identified other than that he was not Van Riessen. He appeared to watch Cardenas.

Fulton next returned to the area of the Spires restaurant and picked up an unidentified white male whom the jury could have reasonably inferred, in the context of time and place, was Cardenas. She then went to an apartment complex and picked up another white male. The three occupants of the car drove to the Doubletree Inn on North Central Expressway in Dallas. They arrived at the hotel at 2:40 p.m. on March 11. The two individuals accompanying Fulton are not positively identified in the record.

Van Riessen registered in room 1506 at the Doubletree Inn under the name of "James Anthony" at 2:39 on the afternoon of March 11, 1983.[1] He was accompanied by another individual, whom the registration clerk was unable to identify. Van Riessen paid for the hotel room and made all of the accommodation arrangements.

On the morning of March 12, 1983, at approximately 8:00 o'clock, the FBI agents began a constant surveillance of Van Riessen's room. The agents observed Van Riessen leave the room twice, very briefly. Other than Van Riessen, no one was observed entering or leaving the room.

---

1. FBI agents noted an arrival time of 2:40 p.m. at the Doubletree for the three occupants of the car. The time of registration, noted by the hotel clerk, was 2:39 p.m. Considering that the time notations were made using different clocks, the difference is not so great as to preclude a reasonable jury from concluding that the two males in the car with Fulton were the two individuals who registered at the Doubletree at 2:39 p.m.

An FBI agent, posing as a hotel room-service employee, entered Van Riessen's hotel room in response to a room-service call. The agent was instructed not to close the hotel room door when she made the delivery. However, when Van Riessen attempted to close the door after she entered the room, several agents rushed it. The occupants of the room at the time the agents entered were Van Riessen, Fulton and Cardenas.

Cardenas's wallet was taken after he was placed in custody. It contained a handwritten notation: "205 Joanne 4937726." This number had previously been given by Fulton as a reference when she rented the Rowlett house. No weapons or drugs were physically found on him. A ticket and boarding pass in the name of Cardenas were also found in the room. The ticket was for American Airlines flight number 575 from Miami to Dallas on March 11, 1982. Fulton's purse was also searched when she was taken into custody. The purse contained an envelope on which was written, "Pan Am flight" and either number "578" or "575" or "570."

The hotel room occupied by Van Riessen, Cardenas and Fulton contained numerous other items of incriminating evidence. Among these items was a shoe box located on a large open shelf in the room. Inside the box were some pill bottles containing 148 methaqualone tablets. Another bottle inside the box contained a powder analyzed to be sixty percent methamphetamine.

Located on an open shelf above the shelf where the shoe box rested, was a ceramic bowl containing 1.1 grams of cocaine residue. Located on the floor beneath the lower shelf was a wing-tip shoe. The heel had been separated about one-and-three-eighths inches from the rest of the shoe and a white powder in a light plastic bag was protruding from it. The bag was later found to run through the sole of the shoe and to contain 181.9 grams of ninety-five percent pure cocaine. On the shelf above the shoe, next to the shoe box, was a

pocket knife. The room also contained numerous "Coca Cola" and "Pepsi" cans, each with a secret compartment. Two cans were on the shelf and others were in a bag on the table next to the window.

Among the other items seized from the hotel was a brown attache case. It contained several loose sheets of papers bearing names and numbers along with other notations. The papers included a Miami telephone number for "Red," an alias by which Cardenas was known. Between February 28, 1983, and March 10, 1983, twelve calls were placed from the Rowlett house to the Miami telephone number. The subscriber of the number was "Marisol Chavarri." Above that name on the telephone toll record was printed "self-employed import-export No. Ctn & PR MUDVI 4350842 PR CARDENAS." During the period between February 28 and March 10, there were several calls from the Miami telephone number to Columbia and Venezuela, South America.

Two individuals, Norman Carey, and Christopher Gandsey, arrived after one of them telephoned and was told by an agent to come up to the room. Norman Carey carried a suitcase to the room which contained only a smaller suitcase and a shaving kit. The other individual, Christopher Gandsey, carried a suitcase filled with clothes and a loaded automatic pistol inside his shaving kit. Sometime later, Michael Patrick Kraal arrived at the room. Kraal had checked into the Sheraton Park Hotel, room 548, on March 11.

Carey was Van Riessen's cousin. At trial, he testified that he flew from California on March 12, 1983, to Dallas, intending to stay one day for the purpose of collecting a $2,800 debt owed him by Van Riessen. Carey testified that he did not expect to meet anyone other than his cousin at the Doubletree Inn. Carey also testified that Gandsey accompanied him to Dallas because of the possibility that he would have to drive a vehicle back to California.[2] The

---

**2.** Carey was called as a witness by the prosecution. He was not represented by an attorney at

the trial. He did not explain why his suitcases

vehicle would have been given as part payment of the debt if Van Riessen did not have sufficient cash.

Telephone toll records admitted into evidence indicated that several calls were made between Carey's number in California and the Rowlett residence. Several calls were also made between the Doubletree and the Sheraton Park. At 3:30 p.m. a call was placed from room 548 at the Sheraton Park to the Doubletree. At 1:52 p.m., a call had been placed from room 548 to Carey's number in California. At 3:33 p.m., a call was placed to Carey's number in California from Van Riessen's room at the Doubletree. Several calls were placed from room 1506 to the Sheraton Park Hotel that day.

Eula Mae Fulton entered a plea of guilty to misprision of a felony prior to trial. The government thereafter subpoenaed her to testify at the trial. She was granted immunity pursuant to the provisions of 18 U.S.C. §§ 6002, 6003. Notwithstanding immunity and the fact that she was ordered to testify by the court, she refused to testify and was found in contempt. The defense presented no evidence at trial.

The defendant was charged with possession of cocaine, methamphetamine, and methaqualone, with the intent to distribute each controlled substance in violation of 21 U.S.C. § 841(a)(1). The jury convicted Cardenas on all counts, but the district court granted a judgment of acquittal on the grounds that the government did not present sufficient evidence to establish that Cardenas constructively possessed the controlled substances. The district judge had previously found, prior to submission of the case to the jury, that there was insufficient evidence to support the government's claim that Cardenas was involved.in a conspiracy to commit the crimes for which he was convicted.

## II.

In order to convict a defendant of possession of a controlled substance in violation of 21 U.S.C. § 841(a)(1), the government must prove the knowing possession of a controlled substance with the intent to distribute it. *United States v. Vergara,* 687 F.2d 57 (5th Cir.1982); *United States v. Moreno,* 649 F.2d 309, 312 (5th Cir.1981). Cardenas argues on appeal that the evidence produced at trial was insufficient to prove that he "possessed" the drugs that were seized in the Dallas hotel room. He claims that the evidence is insufficient because the jury reached its guilty verdict only by making inference upon inference unsupported by direct evidence.

When the issue is the sufficiency of the evidence, we must determine whether a reasonable trier of fact could have found that the evidence establishes guilt beyond a reasonable doubt. *United States v. Loalza-Vasquez,* 735 F.2d 153 (5th Cir.1984); *United States v. Bell,* 678 F.2d 547 (5th Cir.1982) (en banc) *aff'd,* 452 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). In applying this standard, we must consider the evidence, direct and circumstantial, in a light most favorable to the government. We also must accept all reasonable inferences which tend to support the jury's verdict. *United States v. Marx,* 635 F.2d 436 (5th Cir.1981); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

"Possession" of a contraband may be either actual or constructive. *United States v. Riggins,* 563 F.2d 1264 (5th Cir.1977), *cert. denied,* 439 U.S. 948, 99 S.Ct. 148, 58 L.Ed.2d 150 (1978). Actual or constructive possession may be joint with other defendants and may be proven by circumstantial as well as direct evidence. *United States v. Thompson,* 700 F.2d 944 (5th Cir.1983). A person has constructive possession if he has "ownership, dominion or control over the contraband itself, or dominion over the premises in which the contraband is concealed." *United States v. Salinas-Salinas,* 555 F.2d 470, 473 (5th Cir.1977). To find constructive possession, however, more evidence than mere physical proximity of the defendant

were empty, but testified that the luggage was

irrelevant as to why he was in Dallas.

to the controlled substance is required. It is necessary that some nexus between the accused and the prohibited substance be established. *United States v. Ferg,* 504 F.2d 914 (5th Cir.1974). This court has consistently observed, "[M]ere presence in the area where the narcotic is discovered or mere association with the person who does control the drug or the property where it is located, is insufficient to support a finding of possession." *United States v. Stephenson,* 474 F.2d 1353, 1355 (5th Cir.1973).

■ Since there is no evidence that Cardenas was ever in actual, physical possession of the controlled substances, the jury's guilty verdict can be reinstated only if the evidence establishes constructive possession. Having carefully reviewed the record, and as we must on appeal, accepting all reasonable credibility choices that tend to support the jury's verdict, we find that the evidence is sufficient to establish that Cardenas had dominion or control over the controlled substances. This conclusion is not based on any one single factor, but after a careful consideration of all the evidence together. As Judge Rubin[3] has stated, in law, unlike plane geometry, the whole may be greater than the mere sum of the parts. Here, it is only when considering all of the facts together that we can conclude that there is sufficient evidence to reinstate the jury's verdict of guilty.

Each item of evidence must be carefully weighed and considered in its proper context. The first in the series of evidence is Cardenas' arrival in Dallas. The evidence included an airline ticket in Cardenas' name for a Miami to Dallas flight on March 11. An envelope found in Fulton's purse contained a notation for a March 11 flight. Fulton left her house on the morning of March 11, and was seen later that morning driving Cardenas. It was reasonable for the jury to infer from this evidence that Cardenas arrived in Dallas on March 11, and was picked up at the airport by Fulton. While this establishes nothing more than an association between Cardenas and Ful-

ton, this fact must be considered in the context of the parties' later actions.

Fulton never brought Cardenas to her residence. Instead, she dropped him off at a grocery store. Cardenas remained in the grocery store very briefly before proceeding to the nearby intersection. There, he remained pacing and standing, for forty-five minutes. After dropping Cardenas at the store, Fulton returned to her home and picked up another male. She brought this second man to the Days Inn across the street from where Cardenas was standing. This second person went to the hotel's restaurant and appeared to observe Cardenas from the adjacent window. This evidence, of course, does not establish guilt of any crime. It does, however, constitute sufficient evidence from which the jury could have reasonably inferred that Cardenas was not in Dallas for a one-day social visit, but for some other purpose.

The evidence also included numerous telephone calls made between February 28 and March 10 from the Rowlett residence to the Miami number attributed to Cardenas. While we recognize that numerous telephone calls prove nothing more than a close relationship between the parties, *see United States v. Galvan,* 693 F.2d 417 (5th Cir.1982), and the fact that a telephone call was made permits no inferences of guilt of any crimes, or any inference of the subject matter of the conversations, it was another item of circumstantial evidence before the jury for its consideration. The same observation is true with regard to the calls made from the Miami number to Colombia and Venezuela.

The record also contains sufficient evidence from which the jury could have reasonably inferred that Cardenas was not fortuitously in the hotel room at the time the agents entered. For approximately three-and-a-half hours prior to entering, the FBI had maintained the room under constant surveillance. Other than Van Riessen, no one was seen entering or leaving. It is reasonable to infer from this evidence

---

3. *United States v. DeLeon,* 641 F.2d 330 (5th Cir.1981).

that Cardenas was in the hotel room prior to 8:00 a.m.

The FBI found drug paraphernalia in plain view when they entered the room. This included the ceramic bowl containing cocaine residue and the cans containing secret compartments. Drugs also were in plain view. A plastic bag containing cocaine was visible, protruding between the heel and the rest of the shoe. Cardenas, Fulton, and Van Riessen were all in a small, single hotel room for over three-and-one-half hours. From these facts the jury could infer that all of the occupants were fully aware of the presence of this highly incriminating evidence.

After the FBI entered the hotel room shortly after noon, Carey, Gandsey, and Kraal arrived at the hotel room. One of the individuals carried two empty suitcases from which the jury could infer that a purchase and distribution of drugs was to occur.

In sum, the record as a whole contains sufficient evidence of constructive possession to support the conviction. Cardenas arrived in Dallas from Miami on March 11 for only a brief stay. He was picked up by and consorted with others involved in the crime. He engaged in suspicious activity, which indicated that he was not in town for cursory sightseeing or an emergency social visit. There was constant contact between the Rowlett residence and the Miami number prior to his arrival. There were calls from the Miami number to Columbia and Venezuela. Cardenas was present in the room for over three-and-one-half hours where drugs, drug paraphernalia, and drug-concealing devices were in plain view. Cardenas was awaiting the arrival of individuals with empty suitcases. Reasonable inferences from these and other facts provide sufficient nexus to the drugs to establish constructive possession beyond a reasonable doubt to a reasonable-minded jury; or, stated differently, there was a sufficient evidentiary basis for the jury to reasonably conclude that Cardenas exercised significant and culpable dominion and control over the drugs in question.

Cardenas argues that this case is governed by *United States v. Ferg*, 504 F.2d 914 (5th Cir.1974), and *United States v. Gordon*, 700 F.2d 215 (5th Cir.1983). In *Ferg*, the appellant was indicted, tried and convicted for the alleged possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). The testimony indicated that he was a passenger in an automobile driven by his co-defendant when it was stopped by the United States Border Control at an immigration checkpoint in Texas some fifty miles from the Mexican border. The government linked Ferg with the seized marijuana by two items of circumstantial evidence: first, Ferg was travelling with Shaw, the person who purchased the marijuana, and second, Ferg was a passenger in the car in which the marijuana was concealed. The government's evidence did not prove that Ferg had ever maintained possession of the contraband or had any intention of participating in its distribution. Moreover, the government did not establish that Ferg had rented the car in which the marijuana was seized, or even shared in the cost of the rental. There was no evidence to show that Ferg and Shaw had travelled together for a sustained period of time after the marijuana was admittedly obtained by Shaw. We held that this evidence was not sufficient to support the conviction.

*Gordon* is similar to *Ferg*. The co-defendant was riding in the passenger seat of a truck when two border patrol agents stopped the truck and discovered over sixty pounds of marijuana. The stop occurred approximately twenty miles from the Texas border with Mexico. The government presented no evidence to demonstrate the defendant's connection with the contraband except that, upon request, he looked for a screwdriver and volunteered to assist the agent in taking the screws off the boxes found in a hidden compartment. The only other testimony of the agent that related to the defendant concerned the fact that he listened to a football game on the radio while the agents were questioning Gordon. Gordon, the driver of the truck made no

reference to the defendant's participation in any smuggling activity. Beyond the defendant's "mere presence" in the truck, the court found that there was no evidence that indicated that the defendant had maintained control over the contraband, had any intention of participating in the distribution of the contraband, or had any knowledge of it whatsoever.

*Gordon* and *Ferg* are factually distinguishable from the case we consider today. In both those cases, the evidence presented by the government was the proximity of the defendants to the contraband. The evidence against Cardenas shows far more facts from which inferences of guilt may be drawn than presence in a room where drugs were found.

A case more relevant to the "sufficiency of the evidence" question presented by the facts of this case is *United States v. De-Leon,* 641 F.2d 330 (5th Cir.1981). There, the Fifth Circuit upheld a conviction of the defendant on the basis of purely circumstantial evidence. The defendant and another alleged co-conspirator, Morquecho, were observed leaving a house and entering a pickup truck. Morquecho, the driver, carried an orange paper bag from the house and into the cab of the truck. When the individuals noticed the agents following them, the truck accelerated rapidly and began a circuitous route. The agents pursued the truck, losing sight of it only one time for a few moments. After the agents flashed their car's headlights and sounded its horn, the driver of the pickup pulled over and stopped. The truck was immediately searched but the orange bag was not found. They later found an orange bag containing 294 grams of cocaine in some bushes on the passenger's (DeLeon's) side of the street on the route travelled by the pickup. The agents did not see the orange bag thrown from the cab of the truck; rather, it was found along that part of the route where the agents lost sight of the vehicle. DeLeon challenged the sufficiency of the evidence of the substantive offense that he was in possession of cocaine with intent to distribute it. The pivotal factor in DeLeon's conviction was the sufficiency of

proof of DeLeon's "possession" of the orange paper bag. DeLeon portrayed his role as that of a mere passenger in the truck during the incident; in other words, he was merely present. The court disagreed and found the following evidence significant in establishing constructive possession of the contraband and upholding his conviction: (1) his demeanor during the agents' pursuit of the pickup (DeLeon and Morquecho talking to each other and looking at the agents following them); (2) the fact that the jury might have inferred that it was DeLeon, the passenger, who tossed the bag from the window of the truck to the side of the road; and (3) the fact that he was at the home of another co-conspirator (Martinez) shortly after Martinez had been picked up in Dallas for possession of cocaine.

We find the evidence of constructive possession against Cardenas here stronger than the evidence against DeLeon. Cardenas flew to Dallas from Miami for a brief visit. He engaged in suspicious activities prior to his apprehension, and he, along with the person seen driving him the previous day, was present in a room for over three-and-one-half hours where drugs and other incriminating evidence were in plain view. Other individuals arrived at this room, apparently for a meeting and a drug-related transaction. Additionally, telephone toll records indicate that calls were made to a number attributed to Cardenas in Miami and to Carey's California number from Fulton's residence. Surely, if the evidence was sufficient to establish that DeLeon constructively possessed the contraband, the evidence against Cardenas clearly and undoubtedly supports his conviction.

With respect to the second element of the offense, the intent to distribute, the record also contains sufficient evidence to support the jury's finding. The cocaine was ninety-five percent pure. The testimony of a forensic chemist with the Drug Enforcement Administration indicated that cocaine of that purity is too strong for personal use. The quantity of cocaine possessed, along with its purity, gives rise to

the presumption that Cardenas possessed the drug with the intent to distribute. *United States v. Mendoza,* 722 F.2d 96 (5th Cir.1983). Moreover, the presence of the suitcases, the shoe with a false heel, and the "Coca Cola" cans with secret compartments establishes that Cardenas knew that cocaine as well as the other illicit drugs were to be distributed.

### III.

■ Finally, Cardenas contends that this court lacks jurisdiction to hear this appeal. If we understand his argument, it goes as follows: if the judgment of acquittal is reversed by this court, this case will have to be retried because of the alleged prejudicial comments made by the prosecutor; and, if retried, the defendant's double jeopardy rights are violated. Completing his jurisdictional argument, the defendant asserts that the statute allowing this government appeal in a criminal case, 18 U.S.C. § 3731, provides that no appeal by the United States shall lie where further prosecution is prohibited by double jeopardy. Since a successful appeal here, he contends, means further prosecution, which is prohibited by double jeopardy, there is no basis of jurisdiction for this appeal. We reject the defendant's argument.

First, the district court granted the post-verdict judgment of acquittal on the grounds that there was insufficient evidence to support the jury's verdict. While the court was concerned about the prosecutor's statements made at trial, the judgment of acquittal was not granted on that ground. The law is clear that the government can appeal a post-verdict judgment of acquittal when a reversal of the district court requires only the reinstatement of the guilty verdict of the fact finder, and does not subject the appellee to a new trial. *United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978); *United States v. Black,* 644 F.2d 445 (5th Cir.1981);

*United States v. Burns,* 597 F.2d 939 (5th Cir.1979).

■ Second, the defendant currently is before the court in the role solely of an appellee. As such, he is allowed only to respond to the government's arguments. *United States v. Williams,* 679 F.2d 504 (5th Cir.1982), *cert. denied,* 459 U.S. 1111, 103 S.Ct. 742, 74 L.Ed.2d 963 (1983). Cardenas will be able to raise the issue of whether the prosecutor's statements warrant a mistrial once the district court's judgment of acquittal has been reversed, the case remanded, and sentence imposed. The issue, however, is not currently before this court.[4]

### IV.

For the reasons we have stated, we find that the record contains sufficient evidence to support the jury's verdict. The judgment of acquittal is reversed. The case is remanded to the district court to reinstate the jury's verdict of guilty.

REVERSED and REMANDED.

**4.** We do not accept that, nor do we decide whether, *vel non,* double jeopardy attaches in the event a retrial is required because of the alleged prejudicial comments by the prosecutor.

That is a matter for the district court to first determine. *See Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).